HENRY DOTY, APPELLANT, v. LUTHERAN HOSPITAL AS-
SOCIATION ET AL., APPELLEES.

FILED JUNE 27, 1923. No. 22438.

1. **Physicians and Surgeons.** NEGLIGENCE: QUESTION FOR JURY. Plaintiff sustained a broken femur, or thigh bone, and a part of the treatment at a hospital consisted of pressure upon the fractured parts by means of a wire screen device, shaped like a legging, the pressure being adjusted by loosening or tightening straps as the condition of the leg seemed to require from time to time. The ad-

justment of the pressure was left to the patient who was bedfast and in a badly crippled condition. *Held,* that whether the leaving of such adjustment to the patient constituted negligence was a question of fact for the jury.

2. ———: ———: ———. The broken femur, or thigh bone, of a patient of 41 years was examined, at a hospital where he was a patient, only three times by the surgeon in the course of seven weeks and a day, when he was sent home. Each examination was concluded in about ten minutes. *Held,* that whether the infrequency of the examinations constituted negligence was a question of fact for the jury.

3. ———: ———: ———. A patient with a broken femur, or thigh bone, was at a hospital for treatment for seven weeks and a day when he was sent to his home, having in the meantime contracted smallpox, which was known to the physician at the hospital who sent him away, but without informing him that he had the smallpox. Within 15 hours after he reached his home the nature of the disease was discovered and for the first time made known to him and his home was then quarantined for two weeks. Subsequently a member of his family became infected with the same disease and the home was again quarantined for three weeks. *Held,* that whether negligence was chargeable to defendants in the failure to caution the patient or to instruct him with respect to the care he should observe in his contact with his family, and others, was a question of fact for the jury.

4. ———: ———: ———. Plaintiff sustained a fracture of the femur, or thigh bone, and at the end of seven weeks and a day he was discharged from a hospital without any instructions as to the subsequent care that should be given to the injured leg. The evidence tends to prove that the fracture was improperly set at the hospital and that a normal union of the broken parts was thereby prevented. *Held,* that whether the failure to give such instructions to plaintiff constituted negligence was a question of fact for the jury.

5. **Appeal:** DIRECTION OF VERDICT. When plaintiff announced his rest in the present case, the defendants severally moved for a directed verdict and the motions were sustained. The evidence examined, and *held* that the court erred in sustaining the motions.

APPEAL from the district court for Gage county: RALPH D. BROWN, JUDGE. *Reversed.*

*Grant G. Martin* and *Bartos & Bartos,* for appellant.

*Rinaker, Kidd & Delehant* and *Reavis & Beghtol,* contra.

Heard before MORRISSEY, C. J., LETTON, ROSE and DEAN, JJ., BLACKLEDGE, District Judge.

DEAN, J.

Plaintiff sustained a fracture of the femur, or thigh bone, of his left leg about midway between the knee and the hip, and other minor injuries to his head and face, caused by the overturning of an automobile, owing to a defect in a highway, at a bridge approach. When the car turned over, plaintiff was thrown to the bottom of a ditch which was about 22 feet deep. He was immediately taken to the defendant Lutheran Hospital Association at Beatrice for treatment. Plaintiff alleges that the defendant hospital and the defendants Dr. Hepperlen and Dr. Brown "were and are now jointly engaged in the general practice of medicine, surgery and nursing and working together in the establishment, maintaining and conducting of a public hospital for the nursing, medical and surgical care of the sick, injured and afflicted;" and that, after defendants were employed by him, the medical treatment and attention given him was "negligent, careless and unskilful," to his damage in the sum of $20,000. In their respective separate answers defendants denied generally the averments of the petition and each specifically denied plaintiff's allegations which charged carelessness, negligence, lack of skill, and the like.

When plaintiff concluded the introduction of his evidence, the defendants separately moved for a directed verdict on the ground, as alleged, that plaintiff "failed to introduce sufficient evidence to make a *prima facie* case in his favor and against the several moving defendants." The motions were sustained. Thereupon the jury, pursuant to the court's instruction, returned a verdict in favor of the defendants and each of them. Plaintiff appealed.

It was on the day of the accident that plaintiff was

taken to the defendant hospital for treatment and for about five days thereafter he was unconscious. Subsequently his injured leg was bandaged with cotton which was held in place by a circular screen made of light wire, in shape and form like an ordinary legging, the pressure on the leg being adjusted by straps and buckles. Plaintiff testified that Dr. Hepperlen advised him that if the pressure of the screen device hurt him he should loosen the straps, " 'and if it don't hurt you buckle them up a little tighter,' he says, 'I leave that to you.' " He also testified that adhesive straps were used which reached "above the knee cap down over the foot," and that a weight was attached that "pulled a little on it;" that he was confined in the hospital seven weeks and a day and during all of that time he saw Dr. Hepperlen almost every morning, but that his limb was examined only three times, for about ten minutes each time, and that Dr. Hepperlen was the doctor who made each of the examinations.

It has been held that a physician is not chargeable with negligence where intervals elapse between his visits when the patient requires no attention during such intervals, but that he is chargeable with negligence where, during such intervals, the patient requires attention. *Tomer v. Aiken,* 126 Ia. 114.

Continuing plaintiff testified that the broken ends of the bones were not placed in apposition at the hospital but were so placed that one broken end lapped over the other broken end, which shortened the leg about two inches and caused it to be crooked and bow shaped, and that a lump was thereby caused to appear on the front of his leg; that he called attention of the nurses to the lump which was about the size of a goose egg, and that Miss Gerding, the head nurse, and some of the other nurses under her were present, and that one of them said, "That is all right, the doctor will take care of that. I could not tell you anything about it, the doctor will attend to that part of it;" that subsequently he asked Dr.

Hepperlen what caused the lump, and the doctor said,
" 'I don't know, we will look after that tomorrow.' That
was the day that they came in and took the bandage
off."

Plaintiff also testified that defendant Dr. Brown ex-
amined his jaw, which gave him great pain, for what was
believed at the time to be a fracture, and he advised
plaintiff that when he was able he would be taken into
the X-ray room and they would find out the trouble,
but that the jaw bone was given no further attention;
that after he had been at the hospital about six weeks
bed sores developed; that a few days afterwards, when
the nurse gave him his shaving utensils and a looking
glass, he, for the first time, discovered that blotches had
broken out on his face, and when he asked the nurse
what the blotches were she said she did not know but that
she would call Dr. Hepperlen. When the doctor came
to his bedside he said, " 'That is a breaking out caused
from your stomach,' he says, 'That will be all right in a
day or two;' " that the next day, or about that time, Dr.
Hepperlen told plaintiff that he had to go home; that he
protested that he was ill and unable to leave his bed
and could not place his foot on the floor and was in
no condition to be moved, but the doctor said he must
go; that the next day, over his protest, the attendants
and nurses dressed him and, the hospital authorities
having caused notice to be sent to his wife, he was wheeled
out of the hospital on a chair to a truck, where his
wife and a man from his neighborhood were in waiting,
and under such conditions was sent to his home at Vesta.
in Johnson county, 27 miles distant; that, about 15
hours after he was carried into his own house, a physician
was sent for and it was discovered that the blotches on
plaintiff's face and person disclosed smallpox; that his
home was then quarantined for about two weeks, but not
until after perhaps 50 friends and neighbors in his home
community had called upon him; that, when he recovered
and the quarantine was raised, almost immediately one

of his five little ones was stricken with the same malady and the home was again quarantined for about three weeks, or in all about five weeks; that neither Dr. Hepperlin nor the head nurse nor any other person at or connected with the hospital told him or his wife, when he left the hospital, that he had the smallpox and that he did not find it out until informed by a doctor after he arrived at his home.

Two physicians testified that a person becomes infected with smallpox about 14 days after exposure; so that it appears from the evidence that plaintiff acquired the disease while he was a patient at the hospital, but whether plaintiff became infected by the negligence of the defendants or any of them does not appear in the evidence.

That one or more at the hospital knew that plaintiff was so afflicted appears from the evidence of Dr. Ziegler, who testified that, just before plaintiff was sent from the hospital, Dr. Hepperlen telephoned him that "Doty was ready to come home and had the smallpox," and that if he did not go home he would be taken to the pest house. But plaintiff was sent to his home without being told that he was afflicted with a loathsome and contagious disease, and, of course, without any directions or necessary precautions respecting his own safety and the safety of his family and others with whom he would naturally come in contact. Whether negligence was shown was a question of fact for the jury. 30 Cyc. 1574.

That the smallpox was communicated by plaintiff to only one person, a daughter, so far as the record shows, was not due to the defendants' foresight. It may be added, however, that if plaintiff was put to any expense for medical treatment or otherwise, in this behalf, it is not made to appear in the bill of exceptions.

He also testified that when he left the hospital none of the doctors or nurses gave him any instructions about taking care of his injured leg which, up to the time of the trial caused him great and constant pain. It also appears from his evidence that when he walks he has to

keep one leg straight and the other bent, and when in bed he cannot turn over without taking hold of the broken leg and raising it, which causes great pain; that for more than six months after leaving the hospital he went about on crutches and subsequently used a cane, and that at the time of the trial the condition of the leg was practically the same as when he left the hospital.

Dr. Ziegler, of Vesta, testified that he took plaintiff to the defendant hospital shortly after the accident, but that he had nothing to do with setting his leg. With respect to plaintiff's treatment at the hospital the doctor testified that adhesive straps and bandages and weights were used, with sand bags at both sides of the fractured leg to support it; that he examined plaintiff's leg soon after he returned from the hospital and found there a hard lump, which he called a callus; that some fractures of the femur, or thigh bone, require more attention than others, but that in a case like plaintiff's it should be looked after every few days or at least once a week, and that he told plaintiff he should not use his leg for about four weeks. But on the cross-examination the doctor said that when he made the examination plaintiff's leg was in good condition, "that is, like it should be at that stage of the game," and that he found no lump there and nothing unusual or out of the ordinary. He was asked if the limb was shortened, and he said that he did not measure it, but that "there didn't seem to be, no nothing unusual about it." Nevertheless, the X-ray pictures, and the evidence of the doctor who developed them, which follows, all corroborate plaintiff's evidence with respect to improper setting and with respect to the lump and the bend or arch in the leg.

The surgeon who took the X-ray pictures testified: "Q. Now, doctor, you said that in treating the—reducing one of those fractures, that a weight is to be hung on; the sole purpose of that weight is to draw the ends so that the contraction of the muscles will not bring the ends past one another, isn't that it? A. That's the idea.

Q. In other words, the purpose of that is to get the parts of the bone here, as shown in this picture, to come and form into line and not slip past one another, as shown here? A. Yes. Q. That is a fact, isn't it? A. Yes."

It is elementary that such circumstances as are depicted in the foregoing evidence constitute questions of fact bearing on negligence or lack of skill which should be submitted to a jury. *Hickerson v. Neely,* 21 Ky. Law Rep. 1257; *Beck v. German Klinik,* 78 Ia. 696; *Rogers v. Kee,* 171 Mich. 551.

Another physician testified that he seldom let a fracture go more than a week without looking at it, and that sometimes the thigh bone when broken half way between the knee and the hip never unites, while some unite in two months and some in four or five weeks because the bone is large; that a doctor by examination can tell whether the bone will knit; that the open method, that is, cutting into the bone, and the Buck's extension and the double incline are all proper treatments and were customarily used in the vicinity of Beatrice in 1918. In explanation of the "open method" the doctor testified: "Where we are unable to obtain the apposition of the bones we open them, open down to the fracture and put on a Lane plate securing the plate with two or three holes in it, after the bones are put in apposition, securing the Lane plate down into the bones to hold them in position." But in the present case it appears that the "open method," as outlined by the witness, was not used.

Plaintiff testified that he was 41 years of age when the accident happened and was then a healthy and able-bodied man of unusual strength; that at times appropriate to the required work, he ran a threshing machine, a corn sheller and a wood saw, and at odd times worked in a garage, but that when the trial was on he could not do that sort of work but for the most part was confined to the performance of work which he could do while seated. From his evidence it also appears that before the injury his income averaged about $1,400 a year and about

$750 thereafter.  Much of plaintiff's material evidence was corroborated by his wife and sister with respect to the injuries, the treatment and the like.

The argument that there is evidence that should have been submitted to the jury appeals to us.  Among such evidence reference may here be had briefly to the following which tend to establish plaintiff's contention of negligence and malpractice, namely, that of the X-ray pictures and that of the surgeon by whom they were developed; that plaintiff in his crippled condition was left to regulate the adjustment of the pressure of the screen device upon his leg; that the fractured leg was examined only three times in a period of seven weeks and one day; that when plaintiff was discharged he was given no instructions about the treatment or the care of his broken leg; that Dr. Hepperlen knew that plaintiff had the smallpox when he was sent away from the hospital but did not reveal that fact to him; and whether the evidence shows, or fails to show, that plaintiff's limb was treated generally in a negligent, careless and unskilful manner, and whether the "open method" treatment should have been employed, were all material questions of fact, bearing on negligence and lack of skill, which should have been submitted to the jury.

The defendants contend that there is apparently no serious claim by plaintiff that any of the evidence tends to implicate either the Lutheran Hospital Association or Dr. Brown "under the allegations of the petition." Plaintiff does not concede the contention of the defendants on this point, but calls attention to the allegations of his petition, a portion of which appears in the first paragraph of this opinion.  Inasmuch, however, as the case must be remanded for a trial on the merits, we do not find it necessary at this time, in the present state of the record, to decide the question of liability among the several defendants.

In its answer the defendant hospital admitted: "That on February 24, 1918, it was, ever since has been, and

still is a corporation duly organized under the laws of the state of Nebraska with authority to establish, maintain, and conduct a hospital for the accommodation, nursing, healing, and the medical and surgical care of the sick and afflicted, irrespective of race, sex, color, religious belief, or pecuniary circumstances, and to conduct a school for the education and training of nurses."

It may be added that two exhibits are in the record, one of them a bill against plaintiff, dated April 14, 1918, by the Lutheran Hospital Association for board, medicine, dressing and laundry, amounting to $75.25, and another bill for services in setting plaintiff's leg in the sum of $50, dated August 1, 1918, the latter being apparently on a bill-head of Dr. Hepperlen, Dr. Brown and two other physicians. But the bills are not, of course, conclusive on the question of whether the liability is joint or several.

The court erred in directing a verdict for defendants. The judgment is reversed and the cause remanded for a trial on the merits.

REVERSED.