**Mary CROSBY**

v.

**GRANDVIEW NURSING HOME and/or The Travelers Insurance Co.**

Supreme Judicial Court of Maine.

May 1, 1972.

Platz & Day by Thomas E. Day, Jr., John E. Griffin, Lewiston, for plaintiff.

Mahoney, Desmond, Robinson & Mahoney by Lawrence P. Mahoney, Robert F. Hanson, Portland, for defendants.

Before DUFRESNE, C. J., and WEBBER, WEATHERBEE, WERNICK and ARCHIBALD, JJ.

DUFRESNE, Chief Justice.

The decree of the Industrial Accident Commission dated October 19, 1970 ordered that compensation be paid to the plaintiff at the rate of $61.83 for a period of ten weeks from July 28, 1969, the date of her injury, and then cease. The plaintiff appeals from the subsequent pro forma decree. We sustain the appeal.

Mary Crosby, the claimant and appellant, suffered a fracture of the base of the fifth metatarsal of her left foot while in the employ of Grandview Nursing Home, the appellee herein, on July 28, 1969. There is no dispute that the accidental fall which resulted in injury to the appellant was compensable. The only issue before the Commissioner was whether the acute foot strain which later developed was causally related to the original compensable injury. The Commissioner found against the appellant on this issue and his decision generated this appeal.

The physician who treated Mrs. Crosby for her injury had put a walking cast on her left leg on the day of the accident and told her to stay off the cast for three days so that it could harden. The doctor then added she could thereafter pursue her original activity at work. This advice she followed and she continued to work for the Grandview Nursing Home, the appellee, to the extent of her physical capacity until August 28, 1969 when the cast was removed and her employment thereafter discontinued. X-rays taken at that time revealed partial healing of the foot. The doctor testified: "I asked her to guard her activities for the next month."

Approximately two weeks later on September 12, 1969, on her first visit to the doctor since the cast removal, the claimant complained of pain in her foot. The doctor diagnosed the condition as "acute foot strain." Disapproving of the type of shoes Mrs. Crosby was wearing, the doctor testified: "I asked her at that time to get herself some decent supportive shoes to see if they wouldn't relieve her complaints." He further stated that he did *not* indicate at that time that she have an arch support molded to her foot.

The appellant's second visit to the doctor following the removal of the cast was on April 20, 1970. Mrs. Crosby, however, approximately one month earlier had contacted the doctor by phone to complain that the pain was persisting. On this second visit x-rays indicated complete healing of the bone. But, as the doctor testified, she had some pain over the attachment of the plantar ligament to the heel. He further said that at that time Mrs. Crosby had a pair of imitation space shoes which he felt "were not doing the job", that "some other type of shoe would be better" and that "it is more than likely she should have an arch support in her shoes to support her foot more adequately." On re-cross examination of Mrs. Crosby, the following colloquy took place:

"By Mr. Mahoney:

Q. Mrs. Crosby, did the doctor again speak to you about the shoes you were wearing?

A. Well, the last time I went [April 20, 1970] he said—he mentioned some arch supports that I might have, but I didn't ask where to get them and he didn't tell me where to get them or anything.

Mr. Day: Do you have arch supports in these shoes?

A. Yes, I do have."

On re-cross, and after examining the shoes the appellant was wearing at the hearing, the doctor categorically stated: "I have no

objection to space shoes." Those shoes, the claimant testified, were secured after the September 12, 1969 visit when the doctor advised her to get "some decent supportive shoes" and she had worn them ever since that time.

The claimant contends that the Commissioner committed error in law when he found no causal connection between her acute foot strain and the accident.

 We recognize that on appeal from a decree of an Industrial Accident Commissioner the Commissioner's findings of fact are final if they are supported by competent evidence and reasonable inferences which may be drawn therefrom. 39 M.R.S.A. § 99; Soucy v. Fraser Paper, Limited, 1970, Me., 267 A.2d 919. Disability due to an industrial accident, the extent thereof, and the issue of causal relation between the accident and the disability are questions of fact, and the compensation claimant has the burden of proof in establishing the same. Baker's Case, 1947, 143 Me. 103, 55 A.2d 780; MacLeod v. Great Northern Paper Company, 1970, Me., 268 A.2d 488. Such claimant need not, however, prove that the accident was the sole proximate cause of the disability. MacLeod v. Great Northern Paper Company, supra.

 On the other hand, the Commissioner, in arriving at his conclusions, must be guided by legal principles and, if he fails in this, he commits an error of law which this Court is authorized to correct on appeal. Robitaille's Case, 1943, 140 Me. 121, 34 A.2d 473. In the absence of competent evidence to sustain a finding, the issue becomes one of law and it is the duty of this Court under such circumstances to set aside the finding of the Commission. Eleanora Gagnon's Case, 1949, 144 Me. 131, 65 A.2d 6. A decree expressly based in part upon recitals of alleged facts which do not appear in evidence is erroneous as a matter of law. Final findings of fact must be grounded upon evidence presented be-

fore the Commissioner. Gauthier's Case, 1921, 120 Me. 73, 113 A. 28. A ruling based in any degree on a misapprehension of the facts in evidence must be set aside. See, Hinckley's Case, 1940, 136 Me. 403, 11 A.2d 485. The disregard of competent and probative evidence favorable to the claimant constitutes an error of law which would necessitate the sustaining of an appeal from a decree based on such decision. Albert's Case, 1946, 142 Me. 33, 45 A.2d 660; Bernier v. Coca-Cola Bottling Plants, Inc., 1969, Me., 250 A.2d 820.

 Viewed in the perspective of proper legal principles, the Commissioner's decree cannot stand.

The Commissioner correctly stated the issue: "There is no question about the continuing disability of the employee, the only issue is what was the cause thereof."

He further found that on August 28, 1969 when the cast was removed the doctor only advised the claimant "to be careful for at least another month." In fact, the doctor said: "I asked her to guard her activities for the next month." We note at this point that no advice was given to Mrs. Crosby as to the type of shoe she should wear. It is only on September 12, some two weeks after the cast removal, that the doctor asked her to get herself "some decent supportive shoes." He admitted: "I don't think I made any special appliances at that time." To the following question: "So there wasn't any indication at that time with reference to having an arch support molded to the foot?" the doctor answered: "Not at that time, no." The record is clear and undisputed that Mrs. Crosby immediately followed the doctor's recommendation and purchased a pair of imitation space shoes from the Lamey-Wellehan shoe store. She testified, and her testimony is undisputed, that these shoes have an arch support, were fitted to her foot and were worn by her from the time of their purchase immediately after the doctor's advice to her to get "decent supportive shoes." The doctor expressly

said that he had no objection to space shoes.

Although Mrs. Crosby called the doctor on March 16, 1970 and told him, according to the doctor's version of the conversation, that she was still having symptomatology and could only work part time, the record reveals that her appointment with the doctor following their telephonic conversation was April 20, 1970. If Mrs. Crosby's acute foot strain as existed at that time was due, as claimed, in whole or in part to her inadequately supportive shoes, such consequence would be the result of the doctor's failure to have informed the claimant of the specific type of shoe which in his best medical judgment he thought she should wear. Certainly, a shoe with an arch support to which the doctor himself admitted under oath that he had no objection would qualify as a "decent supportive shoe" which the doctor had asked Mrs. Crosby to get on her first visit of September 12, 1969.

■ It is the duty of a physician or surgeon who undertakes to treat a patient to exercise ordinary or reasonable care and diligence in his treatment of the case and use his best judgment in his application of his skill to the case. The treatment of a fractured foot cannot be administered according to fixed and unvarying rules. Some adjustments may have to be made. The doctor's admission that "[o]ne month is a very short time to wear a cast and to get this much difficulty and on the other hand this much difficulty can occur with wearing a cast for a short period of time," indicates that the doctor must anticipate variable eventualities and that under such circumstances it is his duty to watch for any manifestations of foot strain by reason of immobilization and, upon notice that such is occurring, to examine the patient and use his best judgment to determine the cause and employ reasonable care and diligence in the exercise of his skill and the application of his learning to bring about relief. Coombs v. King, 1910, 107 Me. 376, 78 A. 468. The physician or surgeon is answerable for injury to his patient proxi-

mately resulting from his lack of ordinary skill or from the lack of its application, or from neglect or carelessness in the diagnosis and treatment of the case, or failure to exercise his best judgment. Patten v. Wiggin, 1862, 51 Me. 594, 81 Am.Dec. 593; Josselyn v. Dearborn, 1948, 143 Me. 328, 338, 62 A.2d 174.

■ It is the duty of a physician or surgeon, even if personal attention is no longer necessary in the treatment of an injured limb, if the case calls for it, to furnish the patient with instructions as to its care, and his failure to do so, if it proximately aggravates the original injury, would be actionable negligent conduct. Vann v. Harden, 1948, 187 Va. 555, 47 S. E.2d 314; Yard v. Gibbons, 1915, 95 Kan. 802, 149 P. 422, 425; Miles v. Hoffman, 1923, 127 Wash. 653, 221 P. 316; Doty v. Lutheran Hospital Ass'n, 1923, 110 Neb. 467, 194 N.W. 444.

■ Aggravation of the primary injury due to faulty medical after-care by a physician selected with reasonable care, whether the harmful mode of treatment be the result of positive directives given to the patient or the consequence of a failure to advise respecting the proper therapy to follow, even if such faulty treatment reaches the level of actionable tortiousness because of the negligence or lack of skill of the doctor, is regarded as a sequela reasonably to be anticipated and considered a part of the original industrial injury for which the employer is liable under the Act. Steeves v. Irwin, 1967, Me., 233 A.2d 126, 134; Mitchell v. Peaslee, Jr., 1948, 143 Me. 372, 63 A.2d 302. See also, 1 Larson's Workmen's Compensation Law, § 13.21, pp. 192.-81–192.83.

■ The Commissioner, in explanation of his decree allowing compensation only for the normal time for recovery for the injury which the claimant sustained, quoted the doctor as stating: "This is a common injury, and it is seldom, if ever, if (sic) any of the patients have unusual or prolonged convalescences, and certainly this

has never been true to the extent involved with this patient." The record does not reveal that the doctor did make such a statement. The cross-examiner, in referring to the doctor's report, put that alleged medical conclusion to the doctor in the form of a question as to whether he had not so indicated in his report. In overruling an objection thereto by the plaintiff, the Commissioner stressed—"And furthermore this is a comment the doctor made in the report"—as if the report was evidence before him, which was not the case. The doctor was not permitted to answer the question. The Commissioner's obvious use of the doctor's report which was not made a part of the evidence was error as a matter of law. See, Williams v. Harris Baking Company, 1971, Me., 278 A.2d 697; White v. Monmouth Canning Company, 1967, Me., 228 A.2d 795, 802. As a matter of fact, the doctor had said in direct examination that "this much difficulty can occur with wearing a cast for a short period of time."

■ The Commissioner further based his decision that the claimant was not entitled to compensation beyond the normal time for recovery for the injury she had sustained on the ground that the doctor felt the accident was not the cause of her difficulties and gave it as his opinion that "the patient got herself into the problem because of her inadequately supportive shoes during the latter part of her convalescence." The record does not bear out the Commissioner's statement in this regard. The doctor refused to isolate the cause of the acute foot strain to either one of the two factors, the immobilization of the leg muscles due to the wearing of the cast or the inadequate footwear. He testified that the injury was still a factor because of the immobilization and that he knew of no way to diagnose this by means of separating the cast from the shoes. When asked if "It came from those two things you feel?" he answered: "Like I say, I have no other way to explain it." A decree based on a misapprehension of the

facts in evidence is erroneous as a matter of law. See, Hinckley's Case, supra.

■ Prior to April 20, 1970 the doctor had not furnished his patient with the specific instructions respecting footwear which proper medical treatment demanded. The record is uncontradicted that Mrs. Crosby had, as directed by the doctor, purchased and worn a "decent supportive shoe" with arch supports, a shoe to which the doctor at hearing positively stated he had no objection. The claimant's acute foot strain, under the circumstances disclosed in the evidence, was, as a matter of law, the direct and natural causal result at least in part, so conceded by the doctor, of the original injury which necessitated the immobilization of the fractured foot. Where an initial medical condition progresses into complications more serious than the original injury in most cases would have indicated, the added complications are compensable. 1 Larson's Workmen's Compensation Law, § 13.11, p. 192.60. If the claimant's footwear was a contributing factor to her acute foot strain, and if this contributory cause is to be deemed causal negligence resulting in the ultimate condition, then under the evidentiary facts spread on the record before us, the negligent conduct, as a matter of law, must be ascribed solely to the doctor, whose duty it was to properly advise his patient respecting the necessary footwear in the circumstances of the instant case. The Commissioner's decree in its implied finding otherwise is utterly devoid of supportive evidentiary facts. The decree was erroneous in limiting compensation to a period shorter than from July 28, 1969, the date of the injury, to April 20, 1970, the time of the doctor's second visit following the cast removal.

■ Was the claimant entitled to compensation beyond April 20, 1970. The Commissioner found that the claimant's disability continued beyond April 20, 1970, but denied compensation on the ground that Mrs. Crosby did not follow her doc-

tor's advice with respect to shoes and her intervening disregard of the doctor's suggestions was the sole cause of her continued disability.

■ It is true that it is the duty of a patient to follow the reasonable instructions and submit to the reasonable treatment prescribed by his physician or surgeon. Merrill v. Odiorne, 1915, 113 Me. 424, 94 A. 753. In that case, our Court said (prior to our comparative negligence law) that, if the patient failed in that duty and his negligence directly contributed to the injury, he could not maintain an action for malpractice against his physician or surgeon, who was also negligent in treating the case.

In the instant case, the consequential disability continued by reason of the normal necessary and reasonable activity of walking following the immobilization of the injured foot. Aggravation of the 'original injury while walking with inadequate footwear following the cast removal was not, strictly speaking, a happening arising out of and in the course of the claimant's employment, but it would be a consequence to be foreseen by the employer because of the original injury. Larson indicates at page 192.68 of his reference treatise that such normal necessary and reasonable activity during which claimant suffered an aggravation of her initial injury would not bar compensation for the aggravation unless the claimant was guilty of intentional misconduct, such as a willful disregard of her doctor's instructions.

■ Even if the walking with inadequate footwear were considered a nonemployment-related factor and was a contributing cause, with the compensable injury, of an ensuing increased disability, it would not constitute an "independent intervening cause" breaking the causal connection where it was not brought about by the claimant's intentional or negligent misconduct. International Harvester Company v. Industrial Commission, 1970, 46 Ill.2d 238, 263 N.E.2d 49, 54.

■ Aggravation of claimant's condition caused by ordinary incidents of living is compensable as attributable to the condition caused by the original injury. McDougle v. Department of Labor and Industries, 1964, 64 Wash.2d 640, 393 P.2d 631.

Under the undisputed facts in the evidence, Mrs. Crosby was neither guilty of negligent conduct in the choice of her footwear, nor was she guilty of any intentional disregard of her doctor's instructions. The Commissioner's implied finding to the contrary was devoid of any factual evidentiary support. The doctor testified that on the occasion of her April 20th visit, he "felt" that the imitation space shoes were not doing the job, "felt" that some other type of shoe would be better, and "I felt after this length of time that it is more than likely she should have an arch support in her shoes to support her foot more adequately." Nowhere did he positively state that he communicated to Mrs. Crosby these "feelings." The claimant testified that the doctor did mention arch supports that she might have, but "he didn't tell me where to get them or anything." On examination of the space shoes at the hearing, the doctor said he had no objections to the shoes. The doctor further added that at the time of the hearing Mrs. Crosby's symptomatolgy would be helped by a particular type of shoe that might be prescribed for her . . . . "any good shoe store should have a decent oxford shoe, nurses shoe with a steel shank in it that would support an arch support properly. The fitting process is you fit the arch support first and fit the shoe with the arch supports in them." When asked—"She was never given any particular advice to go to any particular place to get this sort of thing done in the sequence that you mentioned?—the doctor answered: "Not that I remember off hand."

Absent a direct instruction not to wear the space shoes which she had bought at the suggestion of the doctor and to get herself another specific type of shoe as he now believes should be prescribed to relieve her disability, Mrs. Crosby who knew that the shoes she was wearing had arch supports cannot be charged either with negligent conduct or intentional misconduct as a matter of law. The Commissioner misconstrued the facts and his error is one of law which this Court must correct.

The entry will be

Appeal sustained. Decree set aside. Case remanded for further proceedings in which the extent of claimant's disability shall be determined consistent with this opinion. Further ordered that an allowance of $350.00 to cover fees and expenses of counsel, plus cost of the record, be paid by the Appellees to the Appellant.

POMEROY, J., did not sit.