**Jerry W. CANTERBURY, Appellant,**

v.

**William Thornton SPENCE and the Washington Hospital Center, a body corporate, Appellees.**

**No. 22099.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 18, 1969.

Decided May 19, 1972.

Rehearing Denied July 20, 1972.

Mr. Earl H. Davis, Washington, D. C., for appellant.

Mr. Walter J. Murphy, Jr., Washington, D. C., for appellee Spence.

Mr. John L. Laskey, Washington, D. C., for appellee Washington Hospital Center.

Before WRIGHT, LEVENTHAL and ROBINSON, Circuit Judges.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

This appeal is from a judgment entered in the District Court on verdicts directed for the two appellees at the conclusion of plaintiff-appellant Canterbury's case in chief. His action sought damages for personal injuries allegedly sustained as a result of an operation negligently performed by appellee Spence, a negligent failure by Dr. Spence to disclose a risk of serious disability inherent in the operation, and negligent post-operative care by appellee Washington Hospital Center. On close examination of the record, we find evidence which required submission of these issues to the jury. We accordingly reverse the judgment as to each appellee and remand the case to the District Court for a new trial.

I

The record we review tells a depressing tale. A youth troubled only by back pain submitted to an operation without being informed of a risk of paralysis incidental thereto. A day after the operation he fell from his hospital bed after having been left without assistance while voiding. A few hours after the fall, the lower half of his body was paralyzed, and he had to be operated on again. Despite extensive medical care, he has never been what he was before. Instead of the back pain, even years later, he hobbled about on crutches, a victim of paralysis of the bowels and urinary incontinence. In a very real sense this lawsuit is an understandable search for reasons.

At the time of the events which gave rise to this litigation, appellant was nineteen years of age, a clerk-typist employed by the Federal Bureau of Investigation. In December, 1958, he began to experience severe pain between his shoulder blades.[1] He consulted two general practitioners, but the medications they prescribed failed to eliminate the pain. Thereafter, appellant secured an appointment with Dr. Spence, who is a neurosurgeon.

Dr. Spence examined appellant in his office at some length but found nothing amiss. On Dr. Spence's advice appellant was x-rayed, but the films did not identify any abormality. Dr. Spence then recommended that appellant undergo a myelogram—a procedure in which dye is injected into the spinal column and traced to find evidence of disease or other disorder—at the Washington Hospital Center.

Appellant entered the hospital on February 4, 1959.[2] The myelogram revealed a "filling defect" in the region of the fourth thoracic vertebra. Since a myelogram often does no more than pinpoint

---

1. Two months earlier, appellant was hospitalized for diagnostic tests following complaints of weight loss and lassitude. He was discharged with a final diagnosis of neurosis and thereafter given supportive therapy by his then attending physician.

2. The dates stated herein are taken from the hospital records. At trial, appellant and his mother contended that the records were inaccurate, but the one-day difference over which they argued is without significance.

the location of an aberration, surgery may be necessary to discover the cause. Dr. Spence told appellant that he would have to undergo a laminectomy—the excision of the posterior arch of the vertebra—to correct what he suspected was a ruptured disc. Appellant did not raise any objection to the proposed operation nor did he probe into its exact nature.

Appellant explained to Dr. Spence that his mother was a widow of slender financial means living in Cyclone, West Virginia, and that she could be reached through a neighbor's telephone. Appellant called his mother the day after the myelogram was performed and, failing to contact her, left Dr. Spence's telephone number with the neighbor. When Mrs. Canterbury returned the call, Dr. Spence told her that the surgery was occasioned by a suspected ruptured disc. Mrs. Canterbury then asked if the recommended operation was serious and Dr. Spence replied "not anymore than any other operation." He added that he knew Mrs. Canterbury was not well off and that her presence in Washington would not be necessary. The testimony is contradictory as to whether during the course of the conversation Mrs. Canterbury expressed her consent to the operation. Appellant himself apparently did not converse again with Dr. Spence prior to the operation.

Dr. Spence performed the laminectomy on February 11 [3] at the Washington Hospital Center. Mrs. Canterbury traveled to Washington, arriving on that date but after the operation was over, and signed a consent form at the hospital. The laminectomy revealed several anomalies: a spinal cord that was swollen and unable to pulsate, an accumulation of large tortuous and dilated veins, and a complete absence of epidural fat which normally surrounds the spine. A thin hypodermic needle was inserted into the spinal cord to aspirate any cysts which might have been present, but no fluid emerged. In suturing the wound, Dr. Spence attempted to relieve the pressure on the spinal cord by enlarging the dura —the outer protective wall of the spinal cord—at the area of swelling.

For approximately the first day after the operation appellant recuperated normally, but then suffered a fall and an almost immediate setback. Since there is some conflict as to precisely when or why appellant fell,[4] we reconstruct the events from the evidence most favorable to him.[5] Dr. Spence left orders that appellant was to remain in bed during the process of voiding. These orders were changed to direct that voiding be done out of bed, and the jury could find that the change was made by hospital personnel. Just prior to the fall, appellant summoned a nurse and was given a receptacle for use in voiding, but was then left unattended. Appellant testified that during the course of the endeavor he slipped off the side of the bed, and that there was no one to assist him, or side rail to prevent the fall.

Several hours later, appellant began to complain that he could not move his legs and that he was having trouble breathing; paralysis seems to have been virtually total from the waist down. Dr. Spence was notified on the night of February 12, and he rushed to the hospital. Mrs. Canterbury signed another consent form and appellant was again taken into the operating room. The surgical wound was reopened and Dr. Spense created a gusset to allow the spinal cord greater room in which to pulsate.

Appellant's control over his muscles improved somewhat after the second operation but he was unable to void properly. As a result of this condition, he came under the care of a urologist while

---

3. The operation was postponed five days because appellant was suffering from an abdominal infection.

4. The one fact clearly emerging from the otherwise murky portrayal by the record, however, is that appellant did fall while

attempting to void and while completely unattended.

5. See Aylor v. Intercounty Constr. Corp., 127 U.S.App.D.C. 151, 153, 381 F.2d 930, 932 (1967), and cases cited in n. 2 thereof.

still in the hospital. In April, following a cystoscopic examination, appellant was operated on for removal of bladder stones, and in May was released from the hospital. He reentered the hospital the following August for a 10-day period, apparently because of his urologic problems. For several years after his discharge he was under the care of several specialists, and at all times was under the care of a urologist. At the time of the trial in April, 1968, appellant required crutches to walk, still suffered from urinal incontinence and paralysis of the bowels, and wore a penile clamp.

In November, 1959 on Dr. Spence's recommendation, appellant was transferred by the F.B.I. to Miami where he could get more swimming and exercise. Appellant worked three years for the F.B.I. in Miami, Los Angeles and Houston, resigning finally in June, 1962. From then until the time of the trial, he held a number of jobs, but had constant trouble finding work because he needed to remain seated and close to a bathroom. The damages appellant claims include extensive pain and suffering, medical expenses, and loss of earnings.

## II

Appellant filed suit in the District Court on March 7, 1963, four years after the laminectomy and approximately two years after he attained his majority. The complaint stated several causes of action against each defendant. Against Dr. Spence it alleged, among other things, negligence in the performance of the laminectomy and failure to inform him beforehand of the risk involved. Against the hospital the complaint charged negligent post-operative care in permitting appellant to remain unattended after the laminectomy, in failing to provide a nurse or orderly to assist him at the time of his fall, and in failing to maintain a side rail on his bed. The answers denied the allegations of negligence and defended on the ground that the suit was barred by the statute of limitations.

Pretrial discovery—including depositions by appellant, his mother and Dr. Spence—continuances and other delays consumed five years. At trial, disposition of the threshold question whether the statute of limitations had run was held in abeyance until the relevant facts developed. Appellant introduced no evidence to show medical and hospital practices, if any, customarily pursued in regard to the critical aspects of the case, and only Dr. Spence, called as an adverse witness, testified on the issue of causality. Dr. Spence described the surgical procedures he utilized in the two operations and expressed his opinion that appellant's disabilities stemmed from his pre-operative condition as symptomized by the swollen, non-pulsating spinal cord. He stated, however, that neither he nor any of the other physicians with whom he consulted was certain as to what that condition was, and he admitted that trauma can be a cause of paralysis. Dr. Spence further testified that even without trauma paralysis can be anticipated "somewhere in the nature of one percent" of the laminectomies performed, a risk he termed "a very slight possibility." He felt that communication of that risk to the patient is not good medical practice because it might deter patients from undergoing needed surgery and might produce adverse psychological reactions which could preclude the success of the operation.

At the close of appellant's case in chief, each defendant moved for a directed verdict and the trial judge granted both motions. The basis of the ruling, he explained, was that appellant had failed to produce any medical evidence indicating negligence on Dr. Spence's part in diagnosing appellant's malady or in performing the laminectomy; that there was no proof that Dr. Spence's treatment was responsible for appellant's disabilities; and that notwithstanding some evidence to show negligent post-operative care, an absence of medical testimony to show causality precluded submission of the case against the hospital to the jury.

The judge did not allude specifically to the alleged breach of duty by Dr. Spence to divulge the possible consequences of the laminectomy.

We reverse. The testimony of appellant and his mother that Dr. Spence did not reveal the risk of paralysis from the laminectomy made out a prima facie case of violation of the physician's duty to disclose which Dr. Spence's explanation did not negate as a matter of law. There was also testimony from which the jury could have found that the laminectomy was negligently performed by Dr. Spence, and that appellant's fall was the consequence of negligence on the part of the hospital. The record, moreover, contains evidence of sufficient quantity and quality to tender jury issues as to whether and to what extent any such negligence was causally related to appellant's post-laminectomy condition. These considerations entitled appellant to a new trial.

Elucidation of our reasoning necessitates elaboration on a number of points. In Parts III and IV we explore the origins and rationale of the physician's duty to reasonably inform an ailing patient as to the treatment alternatives available and the risks incidental to them. In Part V we investigate the scope of the disclosure requirement and in Part VI the physician's privileges not to disclose. In Part VII we examine the role of causality, and in Part VIII the need for expert testimony in non-disclosure litigation. In Part IX we deal with appellees' statute of limitations defense and in Part X we apply the principles discussed to the case at bar.

## III

Suits charging failure by a physician [6] adequately to disclose the risks and alternatives of proposed treatment are not innovations in American law. They date back a good half-century,[7] and in the last decade they have multiplied rapidly.[8] There is, nonetheless, disagreement among the courts and the commentators [9] on many major questions, and there is no precedent of our own directly in point.[10] For the tools enabling resolu-

6. Since there was neither allegation nor proof that the appellee hospital failed in any duty to disclose, we have no occasion to inquire as to whether or under what circumstances such a duty might arise.

7. See, e. g., Theodore v. Ellis, 141 La. 709, 75 So. 655, 660 (1917); Wojciechowski v. Coryell, 217 S.W. 638, 644 (Mo.App. 1920); Hunter v. Burroughs, 123 Va. 113, 96 S.E. 360, 366–368 (1918).

8. See the collections in Annot., 79 A.L.R. 2d 1028 (1961); Comment, Informed Consent in Medical Malpractice, 55 Calif. L.Rev. 1396, 1397 n. 5 (1967).

9. For references to a considerable body of commentary, see Waltz & Scheuneman, Informed Consent to Therapy, 64 Nw.U. L.Rev. 628 n. 1 (1970).

10. In Stivers v. George Washington Univ., 116 U.S.App.D.C. 29, 320 F.2d 751 (1963), a charge was asserted against a physician and a hospital that a patient's written consent to a bi-lateral arteriogram was based on inadequate information, but our decision did not touch the legal aspects of that claim. The jury to which the case was tried found for the physician, and the trial judge awarded judgment for the hospital notwithstanding a jury verdict against it. The patient confined the appeal to this court to the judgment entered for the hospital, and in no way implicated the verdict for the physician. We concluded "that the verdict constitutes a jury finding that [the physician] was not guilty of withholding relevant information from [the patient] or in the alternative that he violated no duty owed her in telling her what he did tell her or in withholding what he did not tell her. . . ." 116 U.S.App.D.C. at 31, 320 F.2d at 753. The fact that no review of the verdict as to the physician was sought thus became critical. The hospital could not be held derivatively liable on the theory of a master-servant relationship with the physician since the physician himself had been exonerated. And since there was no evidence upon which the verdict against the hospital could properly have been predicated independently, we affirmed the trial judge's action in setting it aside. 116 U.S.App.D.C. at 31–32, 320 F.2d at 753–754. In these circumstances, our opinion in Stivers cannot be taken as either approving or disapproving the handling of the risk-nondisclosure issue between the patient and the physician in the trial court.

tion of the issues on this appeal, we are forced to begin at first principles.[11]

■■ The root premise is the concept, fundamental in American jurisprudence, that "[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body. . . ."[12] True consent to what happens to one's self is the informed exercise of a choice, and that entails an opportunity to evaluate knowledgeably the options available and the risks attendant upon each.[13] The average patient has little or no understanding of the medical arts, and ordinarily has only his physician to whom he can look for enlightenment with which to reach an intelligent decision.[14] From these almost axiomatic considerations springs the need, and in turn the requirement, of a reasonable divulgence by physician to patient to make such a decision possible.[15]

11. We undertake only a general outline of legal doctrine on the subject and, of course, a discussion and application of the principles which in our view should govern this appeal. The rest we leave for future litigation.

12. Schloendorff v. Society of New York Hospital, 211 N.Y. 125, 105 N.E. 92, 93 (1914). See also Natanson v. Kline, 186 Kan. 393, 350 P.2d 1093, 1104 (1960), clarified, 187 Kan. 186, 354 P.2d 670 (1960) ; W. Prosser, Torts § 18 at 102 (3d ed. 1964) ; Restatement of Torts § 49 (1934).

13. See Dunham v. Wright, 423 F.2d 940, 943–946 (3d Cir. 1970) (applying Pennsylvania law) ; Campbell v. Oliva, 424 F.2d 1244, 1250–1251 (6th Cir. 1970) (applying Tennessee law) ; Bowers v. Talmage, 159 So.2d 888 (Fla.App.1963) ; Woods v. Brumlop, 71 N.M. 221, 377 P.2d 520, 524–525 (1962) ; Mason v. Ellsworth, 3 Wash.App. 298, 474 P.2d 909, 915, 918–919 (1970).

14. Patients ordinarily are persons unlearned in the medical sciences. Some few, of course, are schooled in branches of the medical profession or in related fields. But even within the latter group variations in degree of medical knowledge specifically referable to particular therapy may be broad, as for example, between a specialist and a general practitioner, or between a physician and a nurse. It may well be, then, that it is only in the unusual case that a court could safely assume that the patient's insights were on a parity with those of the treating physician.

15. The doctrine that a consent effective as authority to form therapy can arise only from the patient's understanding of alternatives to and risks of the therapy is commonly denominated "informed consent." See, e. g., Waltz & Scheuneman, Informed Consent to Therapy, 64 Nw.U.L. Rev. 628, 629 (1970). The same appellation is frequently assigned to the doctrine requiring physicians, as a matter of duty to patients, to communicate information as to such alternatives and risks. See, e. g., Comment, Informed Consent in Medical Malpractice, 55 Calif.L.Rev. 1396 (1967). While we recognize the general utility of shorthand phrases in literary expositions, we caution that uncritical use of the "informed consent" label can be misleading. See, e. g., Plante, An Analysis of "Informed Consent," 36 Ford.L. Rev. 639, 671–72 (1968).

In duty-to-disclose cases, the focus of attention is more properly upon the nature and content of the physician's divulgence than the patient's understanding or consent. Adequate disclosure and informed consent are, of course, two sides of the same coin—the former a *sine qua non* of the latter. But the vital inquiry on duty to disclose relates to the physician's performance of an obligation, while one of the difficulties with analysis in terms of "informed consent" is its tendency to imply that what is decisive is the degree of the patient's comprehension. As we later emphasize, the physician discharges the duty when he makes a reasonable effort to convey sufficient information although the patient, without fault of the physician, may not fully grasp it. See text *infra* at notes 82–89. Even though the factfinder may have occasion to draw an inference on the state of the patient's enlightenment, the factfinding process on performance of the duty ultimately reaches back to what the physician actually said or failed to say. And while the factual conclusion on adequacy of the revelation will vary as between patients— as, for example, between a lay patient and a physician-patient—the fluctuations are attributable to the kind of divulgence which may be reasonable under the circumstances.

A physician is under a duty to treat his patient skillfully [16] but proficiency in diagnosis and therapy is not the full measure of his responsibility. The cases demonstrate that the physician is under an obligation to communicate specific information to the patient when the exigencies of reasonable care call for it.[17] Due care may require a physician perceiving symptoms of bodily abnormality to alert the patient to the condition.[18] It may call upon the physician confronting an ailment which does not respond to his ministrations to inform the patient thereof.[19] It may command the physician to instruct the patient as to any limitations to be presently observed for his own welfare,[20] and as to any precautionary therapy he should seek in the future.[21] It may oblige the physician to advise the patient of the need for or desirability of any alternative treatment promising greater benefit than that being pursued.[22] Just as plainly, due care normally demands that the physician warn the patient of any risks to his well-being which contemplated therapy may involve.[23]

The context in which the duty of risk-disclosure arises is invariably the occasion for decision as to whether a particular treatment procedure is to be undertaken. To the physician, whose training enables a self-satisfying evaluation, the answer may seem clear, but it is the prerogative of the patient, not the physician, to determine for himself the direction in which his interests seem to lie.[24] To enable the patient to chart his course understandably, some familiarity with the therapeutic alternatives and their hazards becomes essential.[25]

16. Brown v. Keaveny, 117 U.S.App.D.C. 117, 118, 326 F.2d 660, 661 (1963); Quick v. Thurston, 110 U.S.App.D.C. 169, 171, 290 F.2d 360, 362, 88 A.L.R.2d 299 (en banc 1961); Rodgers v. Lawson, 83 U.S.App.D.C. 281, 282, 170 F.2d 157, 158 (1948).

17. See discussion in McCoid, The Care Required of Medical Practitioners, 12 Vand. L.Rev. 549, 586–97 (1959).

18. See Union Carbide & Carbon Corp. v. Stapleton, 237 F.2d 229, 232 (6th Cir. 1956); Maertins v. Kaiser Foundation Hosp., 162 Cal.App.2d 661, 328 P.2d 494, 497 (1958); Doty v. Lutheran Hosp. Ass'n, 110 Neb. 467, 194 N.W. 444, 445, 447 (1923); Tvedt v. Haugen, 70 N.D. 338, 294 N.W. 183, 187 (1940). See also Dietze v. King, 184 F.Supp. 944, 948, 949 (E.D.Va.1960); Dowling v. Mutual Life Ins. Co., 168 So.2d 107, 116 (La.App.1964), writ refused, 247 La. 248, 170 So.2d 508 (1965).

19. See Rahn v. United States, 222 F.Supp. 775, 780–781 (S.D.Ga.1963) (applying Georgia law); Baldor v. Rogers, 81 So.2d 658, 662, 55 A.L.R.2d 453 (Fla.1955); Manion v. Tweedy, 257 Minn. 59, 100 N.W.2d 124, 128, 129 (1959); Tvedt v. Haugen, supra note 18, 294 N.W. at 187; Ison v. McFall, 55 Tenn.App. 326, 400 S.W.2d 243, 258 (1964); Kelly v. Carroll, 36 Wash.2d 482, 219 P.2d 79, 88, 19 A.L.R.2d 1174, cert. denied, 340 U.S. 892, 71 S.Ct. 208, 95 L.Ed. 646 (1950).

20. Newman v. Anderson, 195 Wis. 200, 217 N.W. 306 (1928). See also Whitfield v. Daniel Constr. Co., 226 S.C. 37, 83 S.E. 2d 460, 463 (1954).

21. Beck v. German Klinik, 78 Iowa 696, 43 N.W. 617, 618 (1889); Pike v. Honsinger, 155 N.Y. 201, 49 N.E. 760, 762 (1898); Doan v. Griffith, 402 S.W.2d 855, 856 (Ky.1966).

22. The typical situation is where a general practitioner discovers that the patient's malady calls for specialized treatment, whereupon the duty generally arises to advise the patient to consult a specialist. See the cases collected in Annot., 35 A.L.R.3d 349 (1971). See also Baldor v. Rogers, supra note 19, 81 So.2d at 662; Garafola v. Maimonides Hosp., 22 A.D.2d 85, 253 N.Y.S.2d 856, 858, 28 A.L.R.3d 1357 (1964); aff'd, 19 N.Y.2d 765, 279 N.Y.S.2d 523, 226 N.E.2d 311, 28 A.L.R. 3d 1362 (1967); McCoid, The Care Required of Medical Practitioners, 12 Vand. L.Rev. 549, 597–98 (1959).

23. See, e. g., Wall v. Brim, 138 F.2d 478, 480–481 (5th Cir. 1943), consent issue tried on remand and verdict for plaintiff aff'd., 145 F.2d 492 (5th Cir. 1944), cert. denied, 324 U.S. 857, 65 S.Ct. 858, 89 L. Ed. 1415 (1945); Belcher v. Carter, 13 Ohio App.2d 113, 234 N.E.2d 311, 312 (1967); Hunter v. Burroughs, supra note 7, 96 S.E. at 366; Plante, An Analysis of "Informed Consent," 36 Ford.L.Rev. 639, 653 (1968).

24. See text supra at notes 12–13.

25. See cases cited supra notes 14–15.

A reasonable revelation in these respects is not only a necessity but, as we see it, is as much a matter of the physician's duty. It is a duty to warn of the dangers lurking in the proposed treatment, and that is surely a facet of due care.[26] It is, too, a duty to impart information which the patient has every right to expect.[27] The patient's reliance upon the physician is a trust of the kind which traditionally has exacted obligations beyond those associated with arms-length transactions.[28] His dependence upon the physician for information affecting his well-being, in terms of contemplated treatment, is well-nigh abject. As earlier noted, long before the instant litigation arose, courts had recognized that the physician had the responsibility of satisfying the vital informational needs of the patient.[29] More recently, we ourselves have found "in the fiducial qualities of [the physician-patient] relationship the physician's duty to reveal to the patient that which in his best interests it is important that he should know."[30] We now find, as a part of the physician's overall obligation to the patient, a similar duty of reasonable disclosure of the choices with respect to proposed therapy and the dangers inherently and potentially involved.[31]

This disclosure requirement, on analysis, reflects much more of a change in doctrinal emphasis than a substantive addition to malpractice law. It is well established that the physician must seek and secure his patient's consent before commencing an operation or other course of treatment.[32] It is also

26. See text *supra* at notes 17–23.

27. Some doubt has been expressed as to ability of physicians to suitably communicate their evaluations of risks and the advantages of optional treatment, and as to the lay patient's ability to understand what the physician tells him. Karchmer, Informed Consent: A Plaintiff's Medical Malpractice "Wonder Drug," 31 Mo.L.Rev. 29, 41 (1966). We do not share these apprehensions. The discussion need not be a disquisition, and surely the physician is not compelled to give his patient a short medical education; the disclosure rule summons the physician only to a reasonable explanation. See Part V, *infra*. That means generally informing the patient in nontechnical terms as to what is at stake: the therapy alternatives open to him, the goals expectably to be achieved, and the risks that may ensue from particular treatment and no treatment. See Stinnett v. Price, 446 S.W.2d 893, 894, 895 (Tex. Civ.App.1969). So informing the patient hardly taxes the physician, and it must be the exceptional patient who cannot comprehend such an explanation at least in a rough way.

28. That element comes to the fore in litigation involving contractual and property dealings between physician and patient. See, *e. g.*, Campbell v. Oliva, supra note 13, 424 F.2d at 1250; In re Bourquin's Estate, 161 Cal.App.2d 289, 326 P.2d 604, 610 (1958); Butler v. O'Brien, 8 Ill.2d 203, 133 N.E.2d 274, 277 (1956); Woodbury v. Woodbury, 141 Mass. 329, 5 N.E. 275, 278, 279 (1886); Clinton v. Miller, 77 Okl. 173, 186 P. 932, 933 (1919); Hodge v. Shea, 252 S.C. 601, 168 S.E.2d 82, 84, 87 (1969).

29. See, *e. g.*, Sheets v. Burman, 322 F.2d 277, 279–280 (5th Cir. 1963); Hudson v. Moore, 239 Ala. 130, 194 So. 147, 149 (1940); Guy v. Schuldt, 236 Ind. 101, 138 N.E.2d 891, 895 (1956); Perrin v. Rodriguez, 153 So. 555, 556–557 (La.App. 1934); Schmucking v. Mayo, 183 Minn. 37, 235 N.W. 633 (1931); Thompson v. Barnard, 142 S.W.2d 238, 241 (Tex.Civ. App.1940), aff'd, 138 Tex. 277, 158 S.W. 2d 486 (1942).

30. Emmett v. Eastern Dispensary & Cas. Hosp., 130 U.S.App.D.C. 50, 54, 396 F.2d 931, 935 (1967). See also, Swan, The California Law of Malpractice of Physicians, Surgeons, and Dentists, 33 Calif. L.Rev. 248, 251 (1945).

31. See cases cited *supra* notes 16–28; Berkey v. Anderson, 1 Cal.App.3d 790, 82 Cal.Rptr. 67, 78 (1970); Smith, Antecedent Grounds of Liability in the Practice of Surgery, 14 Rocky Mt.L.Rev. 233, 249–50 (1942); Swan, The California Law of Malpractice of Physicians, Surgeons, and Dentists, 33 Calif.L.Rev. 248, 251 (1945); Note, 40 Minn.L.Rev. 876, 879–80 (1956).

32. See cases collected in Annot., 56 A.L.R. 2d 695 (1967). Where the patient is incapable of consenting, the physician may have to obtain consent from someone else. See, *e. g.*, Bonner v. Moran, 75 U.S.App. D.C. 156, 157–158, 126 F.2d 121, 122–123, 139 A.L.R. 1366 (1941).

clear that the consent, to be efficacious, must be free from imposition upon the patient.[33] It is the settled rule that therapy not authorized by the patient may amount to a tort—a common law battery —by the physician.[34] And it is evident that it is normally impossible to obtain a consent worthy of the name unless the physician first elucidates the options and the perils for the patient's edification.[35] Thus the physician has long borne a duty, on pain of liability for unauthorized treatment, to make adequate disclosure to the patient.[36] The evolution of the obligation to communicate for the patient's benefit as well as the physician's protection has hardly involved an extraordinary restructuring of the law.

## IV

Duty to disclose has gained recognition in a large number of American jurisdictions,[37] but more largely on a different rationale. The majority of courts dealing with the problem have made the duty depend on whether it was the custom of physicians practicing in the community to make the particular disclosure to the patient.[38] If so, the physician may be held liable for an unreasonable and injurious failure to divulge, but there can be no recovery unless the omission forsakes a practice prevalent in the profession.[39] We agree that the physician's noncompliance with a professional custom to reveal, like any other departure from prevailing medical practice,[40] may give rise to liability to the patient. We do not agree that the patient's cause of action is dependent upon the existence and nonperformance of a relevant professional tradition.

There are, in our view, formidable obstacles to acceptance of the notion that the physician's obligation to disclose is either germinated or limited by medical practice. To begin with, the reality of any discernible custom reflecting a professional concensus on communication of option and risk information to patients is open to serious doubt.[41] We sense the danger that what in fact is no

33. See Restatement (Second) of Torts §§ 55-58 (1965).

34. See, e. g., Bonner v. Moran, *supra* note 32, 75 U.S.App.D.C. at 157, 126 F.2d at 122, and cases collected in Annot., 56 A.L.R.2d 695, 697-99 (1957). See also Part IX, *infra*.

35. See cases cited *supra* note 13. See also McCoid, The Care Required of Medical Practitioners, 12 Vand.L.Rev. 549, 587-91 (1959).

36. We discard the thought that the patient should ask for information before the physician is required to disclose. Caveat emptor is not the norm for the consumer of medical services. Duty to disclose is more than a call to speak merely on the patient's request, or merely to answer the patient's questions; it is a duty to volunteer, if necessary, the information the patient needs for intelligent decision. The patient may be ignorant, confused, overawed by the physician or frightened by the hospital, or even ashamed to inquire. See generally Note, Restructuring Informed Consent: Legal Therapy for the Doctor-Patient Relationship, 79 Yale L.J. 1533, 1545-51 (1970). Perhaps relatively few patients could in any event identify the relevant questions in the absence of prior explanation by the physician. Physicians and hospitals have patients of widely divergent socio-economic backgrounds, and a rule which presumes a degree of sophistication which many members of society lack is likely to breed gross inequities. See Note, Informed Consent as a Theory of Medical Liability, 1970 Wis.L.Rev. 879, 891-97.

37. The number is reported at 22 by 1967. Comment, Informed Consent in Medical Malpractice, 55 Calif.L.Rev. 1396, 1397, and cases cited in n. 5 (1967).

38. See, e. g., DiFilippo v. Preston, 3 Storey 539, 53 Del. 539, 173 A.2d 333, 339 (1961); Haggerty v. McCarthy, 344 Mass. 136, 181 N.E.2d 562, 565, 566 (1962); Roberts v. Young, 369 Mich. 133, 119 N.W.2d 627, 630 (1963); Aiken v. Clary, 396 S.W.2d 668, 675, 676 (Mo. 1965). As these cases indicate, majority-rule courts hold that expert testimony is necessary to establish the custom.

39. See cases cited *supra* note 38.

40. See, e. g., W. Prosser, Torts § 33 at 171 (3d ed. 1964).

41. See, e. g., Comment, Informed Consent in Medical Malpractice, 55 Calif.L.Rev. 1396, 1404-05 (1967); Comment, Valid Consent to Medical Treatment: Need the Patient Know?, 4 Duquesne L.Rev. 450,

custom at all may be taken as an affirmative custom to maintain silence, and that physician-witnesses to the so-called custom may state merely their personal opinions as to what they or others would do under given conditions.[42] We cannot gloss over the inconsistency between reliance on a general practice respecting divulgence and, on the other hand, realization that the myriad of variables among patients [43] makes each case so different that its omission can rationally be justified only by the effect of its individual circumstances.[44] Nor can we ignore the fact that to bind the disclosure obligation to medical usage is to arrogate the decision on revelation to the physician alone.[45] Respect for the patient's right of self-determination on particular therapy [46] demands a standard set by law for physicians rather than one which physicians may or may not impose upon themselves.[47]

More fundamentally, the majority rule overlooks the graduation of reasonable-care demands in Anglo-American jurisprudence and the position of professional custom in the hierarchy. The caliber of the performance exacted by the reasonable-care standard varies between the professional and non-professional worlds, and so also the role of professional custom. "With but few exceptions," we recently declared, "society demands that everyone under a duty to use care observe minimally a general standard." [48] "Familiarly expressed judicially," we added, "the yardstick is that degree of care which a reasonably prudent person would have exercised under the same or similar circumstances." [49] "Beyond this," however, we emphasized, "the law requires those engaging in activities requiring unique knowledge and ability to give a performance commensurate with the undertaking." [50] Thus physicians treating the sick must perform at higher levels than non-physicians in order to meet the reasonable care standard in its special application to physicians [51]— "that degree of care and skill ordinarily exercised by the profession in [the physician's] own or similar localities." [52] And practices adopted by the profession have indispensable value as evidence tending to establish just what that degree of care and skill is.[53]

■ We have admonished, however, that "[t]he special medical standards [54] are but adaptions of the general standard to a group who are required to act as

458–59 (1966); Note, 75 Harv.L.Rev. 1445, 1447 (1962).

42. Comment, Informed Consent in Medical Malpractice, 55 Calif.L.Rev. 1396, 1404 (1967); Note, 75 Harv.L.Rev. 1445, 1447 (1962).

43. For example, the variables which may or may not give rise to the physician's privilege to withhold risk information for therapeutic reasons. See text Part VI, infra.

44. Note, 75 Harv.L.Rev. 1445, 1447 (1962).

45. E. g., W. Prosser, Torts § 32 at 168 (3d ed. 1964); Comment, Informed Consent in Medical Malpractice, 55 Calif.L. Rev. 1396, 1409 (1967).

46. See text supra at notes 12–13.

47. See Berkey v. Anderson, supra note 31, 82 Cal.Rptr. at 78; Comment, Informed Consent in Medical Malpractice, 55 Calif. L.Rev. 1396, 1409–10 (1967). Medical custom bared in the cases indicates the frequency with which the profession has not engaged in self-imposition. See, e. g., cases cited supra note 23.

48. Washington Hosp. Center v. Butler, 127 U.S.App.D.C. 379, 383, 384 F.2d 331, 335 (1967).

49. Id.

50. Id.

51. Id.

52. Rodgers v. Lawson, supra note 16, 83 U.S.App.D.C. at 282, 170 F.2d at 158. See also Brown v. Keaveny, supra note 16, 117 U.S.App.D.C. at 118, 326 F.2d at 661; Quick v. Thurston, supra note 16, 110 U.S.App.D.C. at 171, 290 F.2d at 362.

53. E. g., Washington Hosp. Center v. Butler, supra note 48, 127 U.S.App.D.C. at 383, 384 F.2d at 335. See also cases cited infra note 119.

54. Id. at 383 ns. 10–12, 384 F.2d at 335 ns. 10–12.

reasonable men possessing their medical talents presumably would."[55] There is, by the same token, no basis for operation of the special medical standard where the physician's activity does not bring his medical knowledge and skills peculiarly into play.[56] And where the challenge to the physician's conduct is not to be gauged by the special standard, it follows that medical custom cannot furnish the test of its propriety, whatever its relevance under the proper test may be.[57] The decision to unveil the patient's condition and the chances as to remediation, as we shall see, is ofttimes a non-medical judgment[58] and, if so, is a decision outside the ambit of the special standard. Where that is the situation, professional custom hardly furnishes the legal criterion for measuring the physician's responsibility to reasonably inform his patient of the options and the hazards as to treatment.

■ The majority rule, moreover, is at war with our prior holdings that a showing of medical practice, however probative, does not fix the standard governing recovery for medical malpractice.[59] Prevailing medical practice, we have maintained, has evidentiary value in determinations as to what the specific criteria measuring challenged professional conduct are and whether they have been met,[60] but does not itself define the standard.[61] That has been our position

in treatment cases, where the physician's performance is ordinarily to be adjudicated by the special medical standard of due care.[62] We see no logic in a different rule for nondisclosure cases, where the governing standard is much more largely divorced from professional considerations.[63] And surely in nondisclosure cases the factfinder is not invariably functioning in an area of such technical complexity that it must be bound to medical custom as an inexorable application of the community standard of reasonable care.[64]

■■ Thus we distinguished, for purposes of duty to disclose, the special- and general-standard aspects of the physician-patient relationship. When medical judgment enters the picture and for that reason the special standard controls, prevailing medical practice must be given its just due. In all other instances, however, the general standard exacting ordinary care applies, and that standard is set by law. In sum, the physician's duty to disclose is governed by the same legal principles applicable to others in comparable situations, with modifications only to the extent that medical judgment enters the picture.[65] We hold that the standard measuring performance of that duty by physicians, as by others, is conduct which is reasonable under the circumstances.[66]

55. *Id.* at 384 n. 15, 384 F.2d at 336 n. 15.

56. *E. g.,* Lucy Webb Hayes Nat. Training School v. Perotti, 136 U.S.App.D.C. 122, 127–129, 419 F.2d 704, 710–711 (1969) ; Monk v. Doctors Hosp., 131 U.S.App.D.C. 174, 177, 403 F.2d 580, 583 (1968) ; Washington Hosp. Center v. Butler, *supra* note 48.

57. Washington Hosp. Center v. Butler, *supra* note 48, 127 U.S.App.D.C. at 387–388, 384 F.2d at 336–337. See also cases cited *infra* note 59.

58. See Part V, *infra.*

59. Washington Hosp. Center v. Butler, *supra* note 48, 127 U.S.App.D.C. at 387–388, 384 F.2d at 336–337; Garfield Memorial Hosp. v. Marshall, 92 U.S.App. D.C. 234, 240, 204 F.2d 721, 726–727, 37 A.L.R.2d 1270 (1953) ; Byrom v. East-

ern Dispensary & Cas. Hosp., 78 U.S. App.D.C. 42, 43, 136 F.2d 278, 279 (1943).

60. *E. g.,* Washington Hosp. Center v. Butler, *supra* note 48, 127 U.S.App.D.C. at 383, 384 F.2d at 335. See also cases cited *infra* note 119.

61. See cases cited *supra* note 59.

62. See cases cited *supra* note 59.

63. See Part V, *infra.*

64. Comment, Informed Consent in Medical Malpractice, 55 Calif.L.Rev. 1396, 1405 (1967).

65. See Part VI, *infra.*

66. See Note, 75 Harv.L.Rev. 1445, 1447 (1962). See also authorities cited *supra* notes 17–23.

## V

Once the circumstances give rise to a duty on the physician's part to inform his patient, the next inquiry is the scope of the disclosure the physician is legally obliged to make. The courts have frequently confronted this problem but no uniform standard defining the adequacy of the divulgence emerges from the decisions. Some have said "full" disclosure,[67] a norm we are unwilling to adopt literally. It seems obviously prohibitive and unrealistic to expect physicians to discuss with their patients every risk of proposed treatment—no matter how small or remote [68]—and generally unnecessary from the patient's viewpoint as well. Indeed, the cases speaking in terms of "full" disclosure appear to envision something less than total disclosure,[69] leaving unanswered the question of just how much.

The larger number of courts, as might be expected, have applied tests framed with reference to prevailing fashion within the medical profession.[70] Some have measured the disclosure by "good medical practice," [71] others by what a reasonable practitioner would have bared under the circumstances,[72] and still others by what medical custom in the community would demand.[73] We have explored this rather considerable body of law but are unprepared to follow it. The duty to disclose, we have reasoned, arises from phenomena apart from medical custom and practice.[74] The latter, we think, should no more establish the scope of the duty than its existence. Any definition of scope in terms purely of a professional standard is at odds with the patient's prerogative to decide on projected therapy himself.[75] That prerogative, we have said, is at the very foundation of the duty to disclose,[76] and both the patient's right to know and the physician's correlative obligation to tell him are diluted to the extent that its compass is dictated by the medical profession.[77]

In our view, the patient's right of self-decision shapes the boundaries of the duty to reveal. That right can be effectively exercised only if the patient possesses enough information to enable an intelligent choice. The scope of the physician's communications to the patient, then, must be measured by the patient's need,[78] and that need is the information material to the decision. Thus the test for determining whether a par-

67. *E. g.*, Salgo v. Leland Stanford Jr. Univ. Bd. of Trustees, 154 Cal.App.2d 560, 317 P.2d 170, 181 (1957); Woods v. Brumlop, *supra* note 13, 377 P.2d at 524–525.

68. See Stottlemire v. Cawood, 213 F.Supp. 897, 898 (D.D.C.), new trial denied, 215 F.Supp. 266 (1963); Yeates v. Harms, 193 Kan. 320, 393 P.2d 982, 991 (1964), on rehearing, 194 Kan. 675, 401 P.2d 659 (1965); Bell v. Umstattd, 401 S.W.2d 306, 313 (Tex.Civ.App.1966); Waltz & Scheuneman, Informed Consent to Therapy, 64 Nw.U.L.Rev. 628, 635–38 (1970).

69. See, Comment, Informed Consent in Medical Malpractice, 55 Calif.L.Rev. 1396, 1402–03 (1967).

70. *E. g.*, Shetter v. Rochelle, 2 Ariz.App. 358, 409 P.2d 74, 86 (1965), modified, 2 Ariz.App. 607, 411 P.2d 45 (1966); Ditlow v. Kaplan, 181 So.2d 226, 228 (Fla.App.1965); Williams v. Menehan, 191 Kan. 6, 379 P.2d 292, 294 (1963); Kaplan v. Haines, 96 N.J.Super. 242, 232 A.2d 840, 845 (1967) aff'd, 51 N.J.

404, 241 A.2d 235 (1968); Govin v. Hunter, 374 P.2d 421, 424 (Wyo.1962). This is not surprising since, as indicated, the majority of American jurisdictions find the source, as well as the scope, of duty to disclose in medical custom. See text *supra* at note 38.

71. Shetter v. Rochelle, *supra* note 70, 409 P.2d at 86.

72. *E. g.*, Ditlow v. Kaplan, *supra* note 70, 181 So.2d at 228; Kaplan v. Haines, *supra* note 70, 232 A.2d at 845.

73. *E. g.*, Williams v. Menehan, *supra* note 70, 379 P.2d at 294; Govin v. Hunter, *supra* note 70, 374 P.2d at 424.

74. See Part III, *supra*.

75. See text *supra* at notes 12–13.

76. See Part III, *supra*.

77. For similar reasons, we reject the suggestion that disclosure should be discretionary with the physician. See Note, 109 U.Pa.L.Rev. 768, 772–73 (1961).

78. See text *supra* at notes 12–15.

ticular peril must be divulged is its materiality to the patient's decision: all risks potentially affecting the decision must be unmasked.[79] And to safeguard the patient's interest in achieving his own determination on treatment, the law must itself set the standard for adequate disclosure.[80]

Optimally for the patient, exposure of a risk would be mandatory whenever the patient would deem it significant to his decision, either singly or in combination with other risks. Such a requirement, however, would summon the physician to second-guess the patient, whose ideas on materiality could hardly be known to the physician. That would make an undue demand upon medical practitioners, whose conduct, like that of others, is to be measured in terms of reasonableness. Consonantly with orthodox negligence doctrine, the physician's liability for nondisclosure is to be determined on the basis of foresight, not hindsight; no less than any other aspect of negligence, the issue on nondisclosure must be approached from the viewpoint of the reasonableness of the physician's divulgence in terms of what he knows or should know to be the patient's informational needs. If, but only if, the fact-finder can say that the physician's communication was unreasonably inadequate is an imposition of liability legally or morally justified.[81]

Of necessity, the content of the disclosure rests in the first instance with the physician. Ordinarily it is only he

who is in position to identify particular dangers; always he must make a judgment, in terms of materiality, as to whether and to what extent revelation to the patient is called for. He cannot know with complete exactitude what the patient would consider important to his decision, but on the basis of his medical training and experience he can sense how the average, reasonable patient expectably would react.[82] Indeed, with knowledge of, or ability to learn, his patient's background and current condition, he is in a position superior to that of most others—attorneys, for example—who are called upon to make judgments on pain of liability in damages for unreasonable miscalculation.[83]

From these considerations we derive the breadth of the disclosure of risks legally to be required. The scope of the standard is not subjective as to either the physician or the patient; it remains objective with due regard for the patient's informational needs and with suitable leeway for the physician's situation. In broad outline, we agree that "[a] risk is thus material when a reasonable person, in what the physician knows or should know to be the patient's position, would be likely to attach significance to the risk or cluster of risks in deciding whether or not to forego the proposed therapy." [84]

The topics importantly demanding a communication of information are the inherent and potential hazards of the proposed treatment, the alternatives to

---

79. See Waltz & Scheuneman, Informed Consent to Therapy, 64 N.W.U.L.Rev. 628, 639–41 (1970).

80. See Comment, Informed Consent in Medical Malpractice, 55 Calif.L.Rev. 1396, 1407–10 (1967).

81. See Waltz & Scheuneman, Informed Consent to Therapy, 64 N.W.U.L.Rev. 628, 639–40 (1970).

82. Id.

83. Id.

84. Id. at 640.
The category of risks which the physician should communicate is, of course, no broader than the complement he could

communicate. See Block v. McVay, 80 S.D. 469, 126 N.W.2d 808, 812 (1964). The duty to divulge may extend to any risk he actually knows, but he obviously cannot divulge any of which he may be unaware. Nondisclosure of an unknown risk does not, strictly speaking, present a problem in terms of the duty to disclose although it very well might pose problems in terms of the physician's duties to have known of it and to have acted accordingly. See Waltz & Scheuneman, Informed Consent to Therapy, 64 N.W.U.L. Rev. 628, 630–35 (1970). We have no occasion to explore problems of the latter type on this appeal.

that treatment, if any, and the results likely if the patient remains untreated. The factors contributing significance to the dangerousness of a medical technique are, of course, the incidence of injury and the degree of the harm threatened.[85] A very small chance of death or serious disablement may well be significant; a potential disability which dramatically outweighs the potential benefit of the therapy or the detriments of the existing malady may summons discussion with the patient.[86]

 There is no bright line separating the significant from the insignificant; the answer in any case must abide a rule of reason. Some dangers—infection, for example—are inherent in any operation; there is no obligation to communicate those of which persons of average sophistication are aware.[87] Even more clearly, the physician bears no responsibility for discussion of hazards the patient has already discovered,[88] or those having no apparent materiality to patients' decision on therapy.[89] The disclosure doctrine, like others marking lines between permissible and impermissible behavior in medical practice, is in essence a requirement of conduct prudent under the circumstances. Whenever nondisclosure of particular risk information is open to debate by reasonable-minded men, the issue is for the finder of the facts.[90]

## VI

 Two exceptions to the general rule of disclosure have been noted by the courts. Each is in the nature of a physician's privilege not to disclose, and the reasoning underlying them is appealing. Each, indeed, is but a recognition that, as important as is the patient's right to know, it is greatly outweighed by the magnitudinous circumstances giving rise to the privilege. The first comes into play when the patient is unconscious or otherwise incapable of consenting, and harm from a failure to treat is imminent and outweighs any harm threatened by the proposed treatment. When a genuine emergency of that sort arises, it is settled that the impracticality of confer-

85. See Comment, Informed Consent in Medical Malpractice, 55 Calif.L.Rev. 1396, 1407 n. 68 (1967).

86. See Bowers v. Talmage, supra note 13 (3% chance of death, paralysis or other injury, disclosure required); Scott v. Wilson, 396 S.W.2d 532 (Tex.Civ.App. 1965), aff'd, 412 S.W.2d 299 (Tex.1967) (1% chance of loss of hearing, disclosure required). Compare, where the physician was held not liable. Stottlemire v. Cawood, supra note 68, (1/800,000 chance of aplastic anemia); Yeates v. Harms, supra note 68 (1.5% chance of loss of eye); Starnes v. Taylor, 272 N.C. 386, 158 S.E.2d 339, 344 (1968) (1/250 to 1/500 chance of perforation of esophagus).

87. Roberts v. Young, supra note 38, 119 N.W.2d at 629–630; Starnes v. Taylor, supra note 86, 158 S.E.2d at 344; Comment, Informed Consent in Medical Malpractice, 55 Calif.L.Rev. 1396, 1407 n. 69 (1967); Note, 75 Harv.L.Rev. 1445, 1448 (1962).

88. Yeates v. Harms, supra note 68, 393 P. 2d at 991; Fleishman v. Richardson-Merrell, Inc., 94 N.J.Super. 90, 226 A.2d 843, 845–846 (1967). See also Natanson v. Kline, supra note 12, 350 P.2d at 1106.

89. See text supra at note 84. And compare to the contrary, Oppenheim, Informed Consent to Medical Treatment, 11 Clev.-Mar. L.Rev. 249, 264–65 (1962); Comment, Valid Consent to Medical Treatment: Need the Patient Know?, 4 Duquesne L.Rev. 450, 457–58 (1966), a position we deem unrealistic. On the other hand, we do not subscribe to the view that only risks which would cause the patient to forego the treatment must be divulged, see Johnson, Medical Malpractice—Doctrines of Res Ipsa Loquitur and Informed Consent, 37 U.Colo.L.Rev. 182, 185–91 (1965); Comment, Informed Consent in Medical Malpractice, 55 Calif.L.Rev. 1396, 1407 n. 68 (1967); Note, 75 Harv.L.Rev. 1445, 1446–47 (1962), for such a principle ignores the possibility that while a single risk might not have that effect, two or more might do so. Accord, Waltz & Scheuneman, Informed Consent to Therapy, 64 Nw.U.L. Rev. 628, 635–41 (1970).

90. E. g., Bowers v. Talmage, supra note 13, 159 So.2d at 889; Aiken v. Clary, supra note 38, 396 S.W.2d at 676; Hastings v. Hughes, 59 Tenn.App. 98, 438 S.W.2d 349, 352 (1968).

ring with the patient dispenses with need for it.[91] Even in situations of that character the physician should, as current law requires, attempt to secure a relative's consent if possible.[92] But if time is too short to accommodate discussion, obviously the physician should proceed with the treatment.[93]

■ The second exception obtains when risk-disclosure poses such a threat of detriment to the patient as to become unfeasible or contraindicated from a medical point of view. It is recognized that patients occasionally become so ill or emotionally distraught on disclosure as to foreclose a rational decision, or complicate or hinder the treatment, or perhaps even pose psychological damage to the patient.[94] Where that is so, the cases have generally held that the physician is armed with a privilege to keep the information from the patient,[95] and we think it clear that portents of that type may justify the physician in action he deems medically warranted. The critical inquiry is whether the physician responded to a sound medical judgment that communication of the risk information would present a threat to the patient's well-being.

■■ The physician's privilege to withhold information for therapeutic reasons must be carefully circumscribed, however, for otherwise it might devour the disclosure rule itself. The privilege does not accept the paternalistic notion that the physician may remain silent simply because divulgence might prompt the patient to forego therapy the physician feels the patient really needs.[96] That attitude presumes instability or perversity for even the normal patient, and runs counter to the foundation principle that the patient should and ordinarily can make the choice for himself.[97] Nor does the privilege contemplate operation save where the patient's reaction to risk information, as reasonable foreseen by the physician, is menacing.[98] And even in a situation of that kind, disclosure to a close relative with a view to securing consent to the proposed treatment may be the only alternative open to the physician.[99]

91. E. g., Dunham v. Wright, supra note 13, 423 F.2d at 941–942 (applying Pennsylvania law); Koury v. Follo, 272 N.C. 366, 158 S.E.2d 548, 555 (1968); Woods v. Brumlop, supra note 13, 377 P.2d at 525; Gravis v. Physicians & Surgeons Hosp., 415 S.W.2d 674, 677, 678 (Tex. Civ.App.1967).

92. Where the complaint in suit is unauthorized treatment of a patient legally or factually incapable of giving consent, the established rule is that, absent an emergency, the physician must obtain the necessary authority from a relative. See, e. g., Bonner v. Moran, supra note 32, 75 U.S.App.D.C. at 157–158, 126 F.2d at 122–123 (15-year old child). See also Koury v. Follo, supra note 91 (patient a baby).

93. Compare, e. g., Application of President & Directors of Georgetown College, 118 U.S.App.D.C. 80, 331 F.2d 1000, rehearing en banc denied, 118 U.S.App.D.C. 90, 331 F.2d 1010, cert. denied, Jones v. President and Directors of Georgetown College, Inc., 377 U.S. 978, 84 S.Ct. 1883, 12 L.Ed.2d 746 (1964).

94. See, e. g., Salgo v. Leland Stanford Jr. Univ. Bd. of Trustees, supra note 67, 317 P.2d at 181 (1957); Waltz & Scheuneman, Informed Consent to Therapy, 64 Nw.U.L.Rev. 628, 641–43 (1970).

95. E. g., Roberts v. Wood, 206 F.Supp. 579, 583 (S.D.Ala.1962); Nishi v. Hartwell, 52 Haw. 188, 473 P.2d 116, 119 (1970); Woods v. Brumlop, supra note 13, 377 P.2d at 525; Ball v. Mallinkrodt Chem. Works, 53 Tenn.App. 218, 381 S.W.2d 563, 567–568 (1964).

96. E. g., Scott v. Wilson, supra note 86, 396 S.W.2d at 534–535; Comment, Informed Consent in Medical Malpractice, 55 Calif.L.Rev. 1396, 1409–10 (1967); Note, 75 Harv.L.Rev. 1445, 1448 (1962).

97. See text supra at notes 12–13.

98. Note, 75 Harv.L.Rev. 1445, 1448 (1962).

99. See Fiorentino v. Wenger, 26 A.D.2d 693, 272 N.Y.S.2d 557, 559 (1966), appeal dismissed, 18 N.Y.2d 908, 276 N.Y.S. 2d 639, 223 N.E.2d 46 (1966), reversed on other grounds, 19 N.Y.2d 407, 280 N.Y.S.2d 373, 227 N.E.2d 296 (1967). See also note 92, supra.

## VII

No more than breach of any other legal duty does nonfulfillment of the physician's obligation to disclose alone establish liability to the patient. An unrevealed risk that should have been made known must materialize, for otherwise the omission, however unpardonable, is legally without consequence. Occurrence of the risk must be harmful to the patient, for negligence unrelated to injury is nonactionable.[100] And, as in malpractice actions generally,[101] there must be a causal relationship between the physician's failure to adequately divulge and damage to the patient.[102]

A causal connection exists when, but only when, disclosure of significant risks incidental to treatment would have resulted in a decision against it.[103] The patient obviously has no complaint if he would have submitted to the therapy notwithstanding awareness that the risk was one of its perils. On the other hand, the very purpose of the disclosure rule is to protect the patient against consequences which, if known, he would have avoided by foregoing the treatment.[104] The more difficult question is whether the factual issue on causality calls for an objective or a subjective determination.

It has been assumed that the issue is to be resolved according to whether the factfinder believes the patient's testimony that he would not have agreed to the treatment if he had known of the danger which later ripened into injury.[105] We think a technique which ties the factual conclusion on causation simply to the assessment of the patient's credibility is unsatisfactory. To be sure, the objective of risk-disclosure is preservation of the patient's interest in intelligent self-choice on proposed treatment, a matter the patient is free to decide for any reason that appeals to him.[106] When, prior to commencement of therapy, the patient is sufficiently informed on risks and he exercises his choice, it may truly be said that he did exactly what he wanted to do. But when causality is explored at a post-injury trial with a professedly uninformed patient, the question whether he actually would have turned the treatment down if he had known the risks is purely hypothetical: "Viewed from the point at which he had to decide, would the patient have decided differently had he known something he did not know?"[107] And the answer which the patient supplies hardly represents more than a guess, perhaps tinged by the circumstance that the uncommunicated hazard has in fact materialized.[108]

In our view, this method of dealing with the issue on causation comes in second-best. It places the physician in jeop-

100. Becker v. Colonial Parking, Inc., 133 U.S.App.D.C. 213, 219–220, 409 F.2d 1130, 1136–1137 (1969) ; Richardson v. Gregory, 108 U.S.App.D.C. 263, 266–267, 281 F.2d 626, 629–630 (1960) ; Arthur v. Standard Eng'r. Co., 89 U.S.App.D.C. 399, 401, 193 F.2d 903, 905, 32 A.L.R.2d 408 (1951), cert. denied, 343 U.S. 964, 72 S.Ct. 1057, 96 L.Ed. 1361 (1952) ; Industrial Savs. Bank v. People's Funeral Serv. Corp., 54 App.D.C. 259, 260, 296 F. 1006, 1007 (1924).

101. See Morse v. Moretti, 131 U.S.App.D.C. 158, 403 F.2d 564 (1968) ; Kosberg v. Washington Hosp. Center, Inc., 129 U.S.App.D.C. 322, 324, 394 F.2d 947, 949 (1968) ; Levy v. Vaughan, 42 U.S.App. D.C. 146, 153, 157 (1914).

102. Shetter v. Rochelle, supra note 70, 409 P.2d at 82–85 ; Waltz & Scheuneman, Informed Consent to Therapy, 64 Nw.U.L. Rev. 628, 646 (1970).

103. Shetter v. Rochelle, supra note 70, 409 P.2d at 83–84. See also Natanson v. Kline, supra note 12, 350 P.2d at 1106–1107 ; Hunter v. Burroughs, supra note 7, 96 S.E. at 369.

104. See text supra at notes 23–35, 74–79.

105. Plante, An Analysis of "Informed Consent," 36 Fordham L.Rev. 639, 666–67 (1968) ; Waltz & Scheuneman, Informed Consent to Therapy, 64 Nw.U.L.Rev. 628, 646–48 (1970) ; Comment, Informed Consent in Medical Malpractice, 55 Calif.L. Rev. 1396, 1411–14 (1967).

106. See text supra at notes 12–13.

107. Waltz & Scheuneman, Informed Consent to Therapy, 64 Nw.U.L.Rev. 628, 647 (1970).

108. Id. at 647.

ardy of the patient's hindsight and bitterness. It places the factfinder in the position of deciding whether a speculative answer to a hypothetical question is to be credited. It calls for a subjective determination solely on testimony of a patient-witness shadowed by the occurrence of the undisclosed risk.[109]

Better it is, we believe, to resolve the causality issue on an objective basis: in terms of what a prudent person in the patient's position would have decided if suitably informed of all perils bearing significance.[110] If adequate disclosure could reasonably be expected to have caused that person to decline the treatment because of the revelation of the kind of risk or danger that resulted in harm, causation is shown, but otherwise not.[111] The patient's testimony is relevant on that score of course but it would not threaten to dominate the findings. And since that testimony would probably be appraised congruently with the factfinder's belief in its reasonableness, the case for a wholly objective standard for passing on causation is strengthened. Such a standard would in any event ease the fact-finding process and better assure the truth as its product.

### VIII

In the context of trial of a suit claiming inadequate disclosure of risk information by a physician, the patient has the burden of going forward with evidence tending to establish prima facie the essential elements of the cause of action, and ultimately the burden of proof—the risk of nonpersuasion[112]—on those elements.[113] These are normal impositions upon moving litigants, and no reason why they should not attach in nondisclosure cases is apparent. The burden of going forward with evidence pertaining to a privilege not to disclose,[114] however, rests properly upon the physician. This is not only because the patient has made out a prima facie case before an issue on privilege is reached, but also because any evidence bearing on the privilege is usually in the hands of the physician alone. Requiring him to open the proof on privilege is consistent with judicial policy laying such a burden on the party who seeks shelter from an exception to a general rule and who is more likely to have possession of the facts.[115]

As in much malpractice litigation,[116] recovery in nondisclosure lawsuits has hinged upon the patient's ability to prove through expert testimony that the physician's performance departed from medical custom. This is not surprising since, as we have pointed out, the majority of American jurisdictions have limited the patient's right to know to whatever boon can be found in medical practice.[117] We have already discussed our disagreement with the majority rationale.[118] We now delineate our view on the need for expert testimony in nondisclosure cases.

There are obviously important roles for medical testimony in such cases, and some roles which only medical evidence can fill. Experts are ordinarily indispensable to identify and elucidate for the factfinder the risks of therapy and

109. *Id.* at 646.

110. *Id.* at 648.

111. See cases cited *supra* note 103.

112. See 9 J. Wigmore, Evidence § 2485 (3d ed. 1940).

113. See, *e. g.*, Morse v. Moretti, *supra* note 101, 131 U.S.App.D.C. at 158, 403 F.2d at 564; Kosberg v. Washington Hosp. Center, Inc., *supra* note 101, 129 U.S. App.D.C. at 324, 394 F.2d at 949; Smith v. Reitman, 128 U.S.App.D.C. 352, 353, 389 F.2d 303, 304 (1967).

114. See Part VI, *supra.*

115. See 9 J. Wigmore, Evidence § 2486, 2488, 2489 (3d ed. 1940). See also Raza v. Sullivan, 139 U.S.App.D.C. 184, 186–188, 432 F.2d 617, 619–621 (1970), cert. denied, 400 U.S. 992, 91 S.Ct. 458, 27 L.Ed.2d 440 (1971).

116. See cases cited *infra* note 119.

117. See text *supra* at notes 37–39.

118. See Part IV, *supra.*

the consequences of leaving existing maladies untreated. They are normally needed on issues as to the cause of any injury or disability suffered by the patient and, where privileges are asserted, as to the existence of any emergency claimed and the nature and seriousness of any impact upon the patient from risk-disclosure. Save for relative infrequent instances where questions of this type are resolvable wholly within the realm of ordinary human knowledge and experience, the need for the expert is clear.[119]

The guiding consideration our decisions distill, however, is that medical facts are for medical experts [120] and other facts are for any witnesses—expert or not—having sufficient knowledge and capacity to testify to them.[121] It is evident that many of the issues typically involved in nondisclosure cases do not reside peculiarly within the medical domain. Lay witness testimony can competently establish a physician's failure to disclose particular risk information, the patient's lack of knowledge of the risk, and the adverse consequences following the treatment.[122] Experts are unnecessary to a showing of the materiality of a risk to a patient's decision on treatment, or to the reasonably, expectable effect of risk disclosure on the decision.[123] These conspicuous examples of permissible uses of nonexpert testimony illustrate the relative freedom of broad areas of the legal problem of risk nondisclosure from the demands for expert testimony that shackle plaintiffs' other types of medical malpractice litigation.[124]

119. Lucy Webb Hayes Nat. Training School v. Perotti, *supra* note 56, 136 U.S. App.D.C. at 126–127, 419 F.2d at 708–709 (hospital's failure to install safety glass in psychiatric ward) ; Alden v. Providence Hosp., 127 U.S.App.D.C. 214, 217, 382 F.2d 163, 166 (1967) (caliber of medical diagnosis) ; Brown v. Keaveny, *supra* note 16, 117 U.S.App.D.C. at 118, 326 F.2d at 661 (caliber of medical treatment) ; Quick v. Thurston, *supra* note 16, 110 U.S.App.D.C. at 171–173, 290 F.2d at 362–364 (sufficiency of medical attendance and caliber of medical treatment) ; Rodgers v. Lawson, *supra* note 16, 83 U.S.App.D.C. at 285–286, 170 F.2d at 161–162 (sufficiency of medical attendance, and caliber of medical diagnosis and treatment) ; Byrom v. Eastern Dispensary & Cas. Hosp., *supra* note 59, 78 U.S.App.D.C. at 43, 136 F.2d at 279 (caliber of medical treatment), Christie v. Callahan, 75 U.S.App.D.C. 133, 136, 124 F.2d 825, 828 (1941) (caliber of medical treatment) ; Carson v. Jackson, 52 App.D.C. 51, 55, 281 F. 411, 415 (1922) (caliber of medical treatment).

120. See cases cited *supra* note 119.

121. Lucy Webb Hayes Nat. Training School v. Perotti, *supra* note 56, 136 U.S. App.D.C. at 127–129, 419 F.2d at 709–711 (permitting patient to wander from closed to open section of psychiatric ward) ; Monk v. Doctors Hosp., *supra* note 56, 131 U.S.App.D.C. at 177, 403 F.2d at 583 (operation of electro-surgical machine) ; Washington Hosp. Center v. Butler, *supra* note 48 (fall by unattended x-ray patient) ; Young v. Fishback, 104 U.S.App.D.C. 372, 373, 262 F.2d 469, 470 (1958) (bit of gauze left at operative site) ; Garfield Memorial Hosp. v. Marshall, supra note 59, 92 U.S.App. D.C. at 240, 204 F.2d at 726 (newborn baby's head striking operating table) ; Goodwin v. Hertzberg, 91 U.S.App.D.C. 385, 386, 201 F.2d 204, 205 (1952) (perforation of urethra) ; Byrom v. Eastern Dispensary & Cas. Hosp., *supra* note 59, 78 U.S.App.D.C. at 43, 136 F.2d at 279 (failure to further diagnose and treat after unsuccessful therapy) ; Grubb v. Groover, 62 App.D.C. 305, 306, 67 F.2d 511, 512 (1933), cert. denied, 291 U.S. 660, 54 S.Ct. 377, 78 L.Ed. 1052 (1934) (burn while unattended during x-ray treatment). See also Furr v. Herzmark, 92 U.S.App.D.C. 350, 353–354, 206 F.2d 468, 470–471 (1953) ; Christie v. Callahan, *supra* note 119, 75 U.S.App.D.C. at 136, 124 F.2d at 828) ; Sweeney v. Erving, 35 App.D.C. 57, 62, 43 L.R.A.,N.S. 734 (1910), aff'd, 228 U.S. 233, 33 S.Ct. 416, 57 L.Ed. 815 (1913).

122. See Waltz & Scheuneman, Informed Consent to Therapy, 64 Nw.U.L.Rev. 628, 645, 647 (1970) ; Comment, Informed Consent in Medical Malpractice, 55 Calif. L.Rev. 1396, 1410–11 (1967).

123. See Waltz & Scheuneman, Informed Consent to Therapy, 64 Nw.U.L.Rev. 628, 639–40 (1970) ; Comment, Informed Consent in Medical Malpractice, 55 Calif.L. Rev. 1396, 1411 (1967).

124. One of the chief obstacles facing plaintiffs in malpractice cases has been the

## IX

We now confront the question whether appellant's suit was barred, wholly or partly, by the statute of limitations. The statutory periods relevant to this inquiry are one year for battery actions [125] and three years for those charging negligence.[126] For one a minor when his cause of action accrues, they do not begin to run until he has attained his majority.[127] Appellant was nineteen years old when the laminectomy and related events occurred, and he filed his complaint roughly two years after he reached twenty-one. Consequently, any claim in suit subject to the one-year limitation came too late.

Appellant's causes of action for the allegedly faulty laminectomy by Dr. Spence and allegedly careless post-operative care by the hospital present no problem. Quite obviously, each was grounded in negligence and so was governed by the three-year provision.[128] The duty-to-disclose claim appellant asserted against Dr. Spence, however, draws another consideration into the picture. We have previously observed that an unauthorized operation constitutes a battery, and that an uninformed consent to an operation does not confer the necessary authority.[129] If, therefore, appellant had at stake no more than a recovery of damages on account of a laminectomy intentionally done without intelligent permission, the statute would have interposed a bar.

It is evident, however, that appellant had much more at stake.[130] His interest in bodily integrity commanded protection, not only against an intentional invasion by an unauthorized operation [131] but also against a negligent invasion by his physician's dereliction of duty to adequately disclose.[132] Appellant has asserted and litigated a violation of that duty throughout the case.[133] That claim, like the others, was governed by the three-year period of limitation applicable to negligence actions [134] and was

difficulty, and all too frequently the apparent impossibility, of securing testimony from the medical profession. See, *e. g.*, Washington Hosp. Center v. Butler, *supra* note 48, 127 U.S.App.D.C. at 386 n. 27, 384 F.2d at 338 n. 27; Brown v. Keaveny, *supra* note 16, 117 U.S.App.D.C. at 118, 326 F.2d at 661 (dissenting opinion); Huffman v. Lindquist, 37 Cal.2d 465, 234 P.2d 34, 46 (1951) (dissenting opinion); Comment, Informed Consent in Medical Malpractice, 55 Calif.L.Rev. 1396, 1405–06 (1967); Note, 75 Harv.L.Rev. 1445, 1447 (1962).

125. D.C.Code § 12–301(4) (1967).

126. D.C.Code § 12–301(8), specifying a three-year limitation for all actions not otherwise provided for. Suits seeking damages for negligent personal injury or property damage are in this category. Finegan v. Lumbermens Mut. Cas. Co., 117 U.S.App.D.C. 276, 329 F.2d 231 (1963); Keleket X-Ray Corp. v. United States, 107 U.S.App.D.C. 138, 275 F.2d 167 (1960); Hanna v. Fletcher, 97 U.S. App.D.C. 310, 313, 231 F.2d 469, 472, 58 A.L.R.2d 847, cert. denied, Gichner Iron Works, Inc. v. Hanna, 351 U.S. 989, 76 S.Ct. 1051, 100 L.Ed. 1501 (1956).

127. D.C.Code § 12–302(a) (1) (1967). See also Carson v. Jackson, *supra* note 119, 52 App.D.C. at 53, 281 F. at 413.

128. See cases cited *supra* note 126.

129. See text *supra* at notes 32–36.

130. For discussions of the differences between battery and negligence actions, see, McCoid, A Reappraisal of Liability for Unauthorized Medical Treatment, 41 Minn.L.Rev. 381, 423–25 (1957); Comment, Informed Consent in Medical Malpractice, 55 Calif.L.Rev. 1396, 1399–1400 n. 18 (1967); Note 75 Harv.L.Rev. 1445, 1446 (1962).

131. See Natanson v. Kline, *supra* note 12, 350 P.2d at 1100; Restatement (Second) of Torts §§ 13, 15 (1965).

132. The obligation to disclose, as we have said, is but a part of the physician's general duty to exercise reasonable care for the benefit of his patient. See Part III, *supra*.

133. Thus we may distinguish Morfessis v. Baum, 108 U.S.App.D.C. 303, 305, 281 F. 2d 938, 940 (1960), where an action labeled one for abuse of process was, on analysis, found to be really one for malicious prosecution.

134. See Maercklein v. Smith, 129 Colo. 72, 266 P.2d 1095, 1097–1098 (*en banc* 1954); Hershey v. Peake, 115 Kan. 562, 223 P. 1113 (1924); Mayor v. Dowsett, 240 Or. 196, 400 P.2d 234, 250–251 (*en*

unaffected by the fact that its alternative was barred by the one-year period pertaining to batteries.[135]

## X

■ This brings us to the remaining question, common to all three causes of action: whether appellant's evidence was of such caliber as to require a submission to the jury. On the first, the evidence was clearly sufficient to raise an issue as to whether Dr. Spence's obligation to disclose information on risks was reasonably met or was excused by the surrounding circumstances. Appellant testified that Dr. Spence revealed to him nothing suggesting a hazard associated with the laminectomy. His mother testified that, in response to her specific inquiry, Dr. Spence informed her that the laminectomy was no more serious than any other operation. When, at trial, it developed from Dr. Spence's testimony that paralysis can be expected in one percent of laminectomies, it became the jury's responsibility to decide whether that peril was of sufficient magnitude to bring the disclosure duty into play.[136] There was no emergency to frustrate an opportunity to disclose,[137] and Dr. Spence's expressed opinion that disclosure would have been unwise did not foreclose a contrary conclusion by the jury. There was no evidence that appellant's emotional makeup was such that concealment of the risk of paralysis was medically sound.[138] Even if disclosure to appellant himself might have bred ill consequences, no reason appears for the omission to communicate the information to his mother, particularly in view of his minority.[139] The jury, not Dr. Spence, was the final arbiter of whether nondisclosure was reasonable under the circumstances.[140]

Proceeding to the next cause of action, we find evidence generating issues as to whether Dr. Spence performed the laminectomy negligently and, if so, whether that negligence contributed causally to appellant's subsequent disabilities. A report Dr. Spence prepared after the second operation indicated that at the time he felt that too-tight sutures at the laminectomy site might have caused the paralysis. While at trial Dr. Spence voiced the opinion that the sutures were not responsible, there were circumstances lending support to his original view. Prior to the laminectory, appellant had

banc 1965); McCoid, A Reappraisal of Liability for Unauthorized Medical Treatment, 41 Minn.L.Rev. 381, 424–25, 434 (1957); McCoid, The Care Required of Medical Practitioners, 12 Vand.L.Rev. 586–87 (1959); Plante, An Analysis of "Informed Consent," 36 Fordham L.Rev. 639, 669–71 (1968); Comment, Informed Consent in Medical Malpractice, 55 Calif. L.Rev. 1396, 1399–4100 n. 18 (1967); Note, 75 Harv.L.Rev. 1445, 1446 (1962).

135. See Mellon v. Seymoure, 56 App.D.C. 301, 303, 12 F.2d 836, 837 (1926); Pedesky v. Bleiberg, 251 Cal.App.2d 119, 59 Cal.Rptr. 294 (1967).

136. See text *supra* at notes 81–90.

137. See text *supra* at notes 91–92.

138. See Part VI, *supra*. With appellant's prima facie case of violation of duty to disclose, the burden of introducing evidence showing a privilege was on Dr. Spence. See text *supra* at notes 114–115. Dr. Spence's opinion—that disclosure is medically unwise—was expressed as to patients generally, and not with reference to traits possessed by appellant. His explanation was:

> I think that I always explain to patients the operations are serious, and I feel that any operation is serious. I think that I would not tell patients that they might be paralyzed because of the small percentage, one per cent, that exists. There would be a tremendous percentage of people that would not have surgery and would not therefore be benefited by it, the tremendous percentage that get along very well, 99 per cent.

139. See Part VI, *supra*. Since appellant's evidence was that neither he nor his mother was informed by Dr. Spence of the risk of paralysis from the laminectomy, we need not decide whether a parent's consent to an operation on a nineteen-year-old is ordinarily required. Compare Bonner v. Moran, *supra* note 32, 75 U.S.App.D.C. at 157–158, 126 F.2d at 122–123.

140. See Part V, *supra*.

none of the disabilities of which he now complains. The disabilities appeared almost immediately after the laminectomy. The gusset Dr. Spence made on the second operation left greater room for the spinal cord to pulsate, and this alleviated appellant's condition somewhat. That Dr. Spence's in-trial opinion was hardly the last word is manifest from the fact that the team of specialists consulting on appellant was unable to settle on the origin of the paralysis.

▇ We are advertent to Dr. Spence's attribution of appellant's disabilities to his condition preexisting the laminectomy, but that was a matter for the jury. And even if the jury had found that theory acceptable, there would have remained the question whether Dr. Spence aggravated the preexisting condition. A tortfeasor takes his victim as he finds him, and negligence intensifying an old condition creates liability just as surely as negligence precipitating a new one.[141] It was for the jury to say, on the whole evidence, just what contributions appellant's preexisting condition and Dr. Spence's medical treatment respectively made to the disabilities.

In sum, judged by legal standards, the proof militated against a directed verdict in Dr. Spence's favor. True it is that the evidence did not furnish ready answers on the dispositive factual issues, but the important consideration is that appellant showed enough to call for resolution of those issues by the jury. As in Sentilles v. Inter-Carribbean Shipping Corporation,[142] a case resembling this one, the Supreme Court stated,

The jury's power to draw the inference that the aggravation of petitioner's tubercular condition, evident so shortly after the accident, was in fact caused by that accident, was not impaired by the failure of any medical witness to testify that it was in fact the cause. Neither can it be impaired by the lack of medical unanimity as to the respective likelihood of the potential causes of the aggravation, or by the fact that other potential causes of aggravation existed and were not conclusively negated by the proofs. The matter does not turn on the use of a particular form of words by the physicians in giving their testimony. The members of the jury, not the medical witnesses, were sworn to make a legal determination of the question of causation. They were entitled to take all the circumstances, including the medical testimony into consideration.[143]

▇ We conclude, lastly, that the case against the hospital should also have gone to the jury. The circumstances surrounding appellant's fall—the change in Dr. Spence's order that appellant be kept in bed,[144] the failure to maintain a side rail on appellant's bed, and the absence of any attendant while appellant was attempting to relieve himself—could certainly suggest to jurors a dereliction of the hospital's duty to exercise reasonable care for the safety and well-being of the patient.[145] On the issue of causality, the

141. Bourne v. Washburn, 142 U.S.App.D.C. 332, 336, 441 F.2d 1022, 1026 (1971); Clark v. Associated Retail Credit Men, 70 App.D.C. 183, 187, 105 F.2d 62, 66 (1939); Baltimore & O. R. R. v. Morgan, 35 App.D.C. 195, 200–201 (1910); Washington A. & M. V. Ry. v. Lukens, 32 App. D.C. 442, 453–454 (1909).

142. 361 U.S. 107, 80 S.Ct. 173, 4 L.Ed.2d 142 (1959).

143. *Id.* at 109–110, 80 S.Ct. at (footnote omitted).

144. Even if Dr. Spence himself made the change, the result would not vary as to the hospital. It was or should have been known by hospital personnel that appellant had just undergone a serious operation. A jury might fairly conclude that at the time of the fall he was in no condition to be left to fend for himself. Compare Washington Hosp. Center v. Butler, *supra* note 48, 127 U.S.App.D.C. at 385, 384 F. 2d at 337.

145. Compare *id.* See also cases cited *supra* note 121.

evidence was uncontradicted that appellant progressed after the operation until the fall but, a few hours thereafter, his condition had deteriorated, and there were complaints of paralysis and respiratory difficulty. That falls tend to cause or aggravate injuries is, of course, common knowledge, which in our view the jury was at liberty to utilize.[146] To this may be added Dr. Spence's testimony that paralysis can be brought on by trauma or shock. All told, the jury had available a store of information enabling an intelligent resolution of the issues respecting the hospital.[147]

We realize that, when appellant rested his case in chief, the evidence scarcely served to put the blame for appellant's disabilities squarely on one appellee or the other. But this does not mean that either could escape liability at the hand of the jury simply because appellant was unable to do more. As ever so recently we ruled, "a showing of negligence by each of two (or more) defendants with uncertainty as to which caused the harm does not defeat recovery but passes the burden to the tortfeasors for each to prove, if he can, that he did not cause the harm."[148] In the case before us, appellant's evidentiary presentation on negligence survived the claims of legal insufficiency, and appellees should have been put to their proof.[149]

Reversed and remanded for a new trial.

146. See id. at 383–385, 384 F.2d at 335–337.

147. See id.

148. Bowman v. Redding & Co., 145 U.S. App.D.C. 294, 305, 449 F.2d 956, 967 (1971).

149. Appellant's remaining points on appeal require no elaboration. He contends that his counsel, not the trial judge, should have conducted the voir dire examination of prospective jurors, but that matter lay within the discretion of the judge, Fed.R. Civ.P. 47(a). He argues that Mrs. Canter-bury, a rebuttal witness, should not have been excluded from the courtroom during other stages of the trial. That also was within the trial judge's discretion and, in any event, no prejudice from the exclusion appears. He complains of the trial judge's refusal to admit into evidence by-laws of the hospital pertaining to written consent for surgery, and the judge's refusal to permit two physicians to testify as to medical custom and practice on the same general subject. What we have already said makes it unnecessary for us to deal further with those complaints.